FIFTH DIVISION

No. 1-03-0551

| | | |
|---|---|---|
| In re T.T., a Minor | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
| | ) | Cook County. |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 01 JD 2958 |
| | ) | |
| T.T., | ) | Honorable |
| | ) | Rodney H. Brooks, |
| Respondent-Appellant). | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the modified opinion of the court:

Following a bench trial, respondent T.T. was adjudicated delinquent of two counts of aggravated criminal sexual assault and sentenced to five years of probation. On appeal, respondent contends the trial court erred in finding the complaining witness, G.F., unavailable to testify at trial so as to warrant the preclusion of cross-examination. Furthermore, respondent, citing Crawford v. Washington, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), argues that G.F.'s statements to a police detective, a Department of Children and Family Services (DCFS) investigator, and a physician were testimonial in nature, and that the admission of those statements pursuant to statutory hearsay exceptions in the absence of an opportunity to cross-examine G.F. violated respondent's right to confrontation.

We note here that the Illinois Supreme Court has entered a supervisory order (In re T.T., No. 106081 (May 30, 2008)) directing this court to vacate our previous order of January 22, 2008[1] in this matter and reinstate our September 7, 2007 opinion. In compliance with the Illinois Supreme Court's supervisory order, we reinstate our September 7, 2007 opinion herein, but modify it to provide for a remand to the circuit court for a hearing on the State's claim regarding the doctrine of forfeiture by wrongdoing.

---

[1]The January 22, 2008 order entered by our court vacated the September 7, 2007, opinion filed in this cause, granted petitioner-appellee The People of the State of Illinois' petition for rehearing and remanded the cause to the circuit court for an evidentiary hearing on the limited issue of the equitable doctrine of forfeiture by wrongdoing, in compliance with a previous mandate of the Illinois Supreme Court (In re T.T., 224 Ill. 2d 575 (2007)).

1-03-0551

As we concluded previously, we hold, for the following reasons, the trial court properly determined that G.F. was unavailable. We also find that G.F.'s statements to the police detective and DCFS investigator were testimonial, and her statement to the physician identifying respondent as the perpetrator was testimonial. Because G.F. was not cross-examined at trial, her testimonial statements were not admissible where respondent had no prior opportunity for cross-examination. Because the trial court considered testimonial evidence in the absence of a prior opportunity for cross-examination, we reverse the judgment of the trial court and remand the cause for further proceedings not inconsistent with this opinion.

BACKGROUND

On May 24, 2001, the State filed a petition for adjudication of wardship of respondent, alleging he was delinquent by reason of committing two offenses of aggravated criminal sexual assault. Prior to trial, the State filed a motion under section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2000)) to admit G.F.'s out-of-court statements through her mother P.F., DCFS investigator Gloria Lewis, and Chicago police detective Patricia Dwyer. Section 115-10 provides, in relevant part, that in a prosecution for a sexual act perpetrated against a child under the age of 13, the testimony of the child's out-of-court statements describing any complaint of such an act or matter or detail pertaining to any act which is an element of the charged offense is admissible as an exception to the hearsay rule. 725 ILCS 5/115-10(a) (West 2000). Such testimony is only admitted if the court finds in a pretrial hearing that the time, content and circumstances of the statement provide sufficient safeguards of reliability and the child either testifies at the trial or is "unavailable as a witness" and there is corroborative evidence of the act which is the subject of the statement. 725 ILCS 5/115-10(b) (West 2000).

At the section 115-10 motion hearing, P.F., Lewis and Detective Dwyer testified generally consistently concerning G.F.'s statements about the events in December 2000, when she stayed for 2½ days at the home of Denise T., her babysitter and respondent's mother. G.F. was seven years old at the time. Another girl, respondent's niece A.W., age six, was also there. During G.F.'s stay, respondent, then age 14, allegedly penetrated G.F.'s vagina and anus with his penis.

Specifically, P.F. testified she left G.F. at Denise T.'s home for babysitting on Monday afternoon, December 18, 2000. G.F. had known respondent for four years and called him "Pooh." G.F.'s sister picked G.F. up on Wednesday and returned her home about 11 a.m. As soon as G.F. entered the home, she told P.F., without prompting or questioning, that "Pooh" had "juiced" her and put his "ding-a-ling" in her "bootie" and her "fannie." Based on G.F.'s prior use of those terms, P.F. understood her to mean that respondent had sexual intercourse with her and put his penis in her buttocks and vagina. G.F. told P.F. that respondent did this to her on Monday and again on Tuesday, that it hurt at the time but not anymore, and that he said he would kill her if she told. G.F. said that respondent also "did" A.W. and that when G.F. told Denise T. and respondent's sister about the incidents, they bathed her. Then, P.F. asked G.F. if respondent put his "ding-a-ling" in her mouth, and G.F. answered no. P.F. did not contact the police or take G.F. for medical treatment. G.F. was not examined by a physician until May 7, 2001, after DCFS contacted P.F. DCFS investigator Lewis went to P.F.'s home on May 4, 2001, and spoke to P.F. and G.F.

DCFS investigator Lewis testified that she worked for the child protection unit for several years. Lewis estimated that 95% of her cases involved investigations of allegations of sexual abuse, and she had investigated hundreds of such cases. In March 2001, she received G.F.'s case based on a hotline report indicating G.F. told the reporter that her vagina had been penetrated with a finger. On March 8, 2001, Lewis spoke by telephone with the reporter and learned G.F. told the reporter that respondent put his finger in G.F.'s vagina. Lewis attempted to contact G.F. within 24 hours to assess her safety, but was not able to locate her. On March 12, 2001, Lewis was interviewed by a Ms. Bates, to whom Lewis conveyed the reporter's March 8 statement. Lewis went to P.F. and G.F.'s home several times and left letters, but never made contact with either of them until she drove to their home on May 4, 2001, and saw them leaving the residence. Lewis interviewed G.F. in Lewis's car while P.F. sat in the backseat. Lewis introduced herself to G.F. and asked her several general questions regarding her age, school and the color of clothing to determine how credible she was in her statements. Lewis determined that G.F. knew the difference between telling the truth and a lie. G.F. was talkative, quickly volunteered information, and gave detailed accounts.

Lewis testified that G.F. said she was at Denise T.'s house and playing with A.W. During the daytime, Denise T. went to the store and left G.F. and A.W. in the care of respondent's older sister, but she stayed in her bedroom with the door closed. Respondent entered the living room and told G.F. and A.W. that they were going to play wrestling. Respondent took G.F. into Denise T.'s bedroom and removed G.F.'s one-piece pajama outfit. When respondent pulled her panty down, G.F. tried to pull it back up. Respondent wore pajama bottoms and pulled them down to his thighs. G.F. told Lewis "Pooh" stuck his "thing" in her "fannie" and in her, pointing to indicate her vaginal area. G.F. said a "thing" was a "ding-a-ling." Respondent also took G.F. into the bathroom and stuck his "thing" in her "bootie." On another occasion, respondent had G.F. and A.W. in Denise T.'s bedroom. Respondent had A.W. in a closet and put G.F. on the bed and kissed her on both cheeks. Then, respondent put G.F. in the closet and A.W. on the bed. When G.F. tried to peek to see what respondent was doing to A.W., he threw a cover on her head so she could not see. Respondent told G.F. that if she told anybody, he would kill them, but G.F. told Denise T. and respondent's sister and told her mother as soon as she saw her. Lewis testified that P.F. did not participate in anyway when G.F. made her statement to Lewis. Moreover, Lewis never told G.F. what to say and never had to prompt her.

Detective Dwyer testified that she was investigating the sex crime involving respondent and met G.F. and P.F. at headquarters on May 23, 2001. Detectives Dwyer and Collins interviewed G.F. while P.F. sat right outside the open door of the conference room. The detectives told G.F. that they were police officers and were assigned to investigate sex crime cases. They asked G.F. general questions and determined she was credible, articulate and knew why she was there. The detectives asked G.F. what happened at Denise T.'s house, and G.F. said that respondent brought her into Denise T.'s bedroom and pulled her pants and panty down. When G.F. pulled them back up, respondent pulled them down again, put G.F. on the bed, and put his "thing" in her "privates." G.F. said a "thing" is what boys pee from and "privates" are what girls pee from, and she pointed to indicate her vaginal area. G.F. said that respondent then brought her into the bathroom and put his "thing" in her "bootie" and in her "privates." G.F. pointed to her behind to indicate what a "bootie" was. When the detectives asked how G.F. felt after that, she responded that it hurt her. G.F. said the next day

-4-

respondent did it to her again in his bedroom and caused pain, and that A.W. was there in the closet. G.F. said respondent threatened to kill her if she told anybody, but she told Denise T. and respondent's sister. Dwyer testified that the detectives asked G.F. specific questions and she answered them very matter-of-factly.

At the conclusion of the section 115-10 motion hearing, the State informed the court that it anticipated that G.F. would testify at trial. The trial court held that G.F.'s statements to P.F., Lewis, and Detective Dwyer would be admissible at trial because the time, content and circumstances of the statements provided sufficient safeguards of reliability.

At the trial in August 2002, Dr. Michelle Lorand testified as an expert in the area of pediatric medicine and child abuse and neglect. Dr. Lorand was an attending pediatrician and the chair, since 1992, of the division of child protective services in the pediatric department of Cook County Hospital. Also, she was currently the medical director of the medical clinic at the Chicago Children's Advocacy Center, which was run by Cook County. Dr. Lorand met G.F., who was accompanied by P.F., on May 7, 2001, in the emergency room. They had been referred by DCFS for a medical evaluation of alleged sexual abuse. Dr. Lorand introduced herself and explained she would conduct a physical exam of G.F., including everything that is generally incorporated into a pediatric physical exam and a careful examination of the genital and rectal areas. Dr. Lorand spoke first to P.F. alone, then spoke to G.F. alone to hear in her own words what, if anything, happened to her, and then examined G.F. with P.F. in the room.

When Dr. Lorand asked G.F. if she knew why she was at the hospital, G.F. said to be checked. Dr. Lorand asked if anybody had ever hurt her in her private parts or in the butt or buttocks area, and G.F. said yes. Over the defense's objection, Dr. Lorand testified that when she asked G.F. who hurt her, she responded "Pooh" and explained that he was the son of her mother's friend. Dr. Lorand asked what happened, and G.F. responded that he pulled her pants down to her knees and stuck his "thing" in front and in back, pointing to indicate her genital and rectal areas. G.F. said he put baby oil on his "thing," that it happened one time, that she told her mother when it happened, and she had not seen the person since then. G.F. said it hurt worse when he stuck it in back than in front. G.F. and her

mother reported that G.F. never complained of any hard stool or bowel movement problems, and there was no bleeding or discharge from her vagina or anus.

Dr. Lorand then performed the physical exam. G.F.'s vaginal exam was normal, but her rectal exam revealed two scars, which indicated some tearing or laceration highly suspicious for penetrating-type trauma. Dr. Lorand explained that the vaginal area healed more quickly than the rectum, and some children healed completely from penetrating injuries to the vagina. Based on G.F.'s statement to Dr. Lorand and the physical exam, Dr. Lorand concluded that the injuries were older than two weeks and that G.F. was sexually abused.

When trial resumed in November 2002, the parties stipulated to the testimony of P.F., Lewis, and Detective Dwyer from the section 115-10 motion hearing. G.F. testified that she was nine years old. On direct examination, she answered general questions about her address, school, and family members and demonstrated she knew the difference between the truth and a lie. G.F. identified respondent in court and explained she had known him for some time as the son of her mother's friend, Denise T. In December 2000, G.F.'s mother took her by bus to Denise T.'s house. Although G.F. was supposed to stay there only one day, she stayed three days, sleeping in the living room with A.W.

G.F. testified that when she, A.W. and respondent were play-wrestling in Denise T.'s bedroom, respondent tried to unbutton G.F.'s pants. G.F. remembered how respondent did that, but then said "No," when the prosecutor asked her to tell the judge how respondent did that. When the prosecutor asked G.F. what happened next, G.F. did not respond. The prosecutor told G.F. that it was "okay to tell the judge exactly what happened," but G.F. said, "Nothing."

G.F. testified that the next day she and A.W. were sleeping in the living room, respondent was behind her but did "Nothing," and then the three went into Denise T.'s bedroom. G.F. did not respond when asked what happened next, but said "Yes," when asked if she wanted to take a break. The judge admonished the parties not to speak to G.F. regarding the case, but stated that G.F.'s mother could comfort her during the break. Before resuming, the prosecutor relayed G.F.'s request to testify from the witness stand, explaining G.F. "prefers to be behind here as long as she can be heard and seen." The trial court granted the request.

G.F. testified that respondent unbuttoned her pajama suit in Denise T.'s bedroom, but G.F. would not respond when asked what happened next. Several times during direct questioning, the court sustained defense counsel's objections to the prosecutor's leading questions or comments to G.F. that it was "okay to talk about it," and to "be honest." G.F. testified that something happened after respondent unbuttoned her pajama suit, but she would not respond when asked what happened next. During a sidebar, the prosecutor argued that he was entitled to lead the witness, but the trial court, acknowledging the sensitive nature of the proceedings, stated that G.F. must present the evidence without being led. Upon resumption of questioning, the following occurred:

"MR. HARVATH [Assistant State's Attorney]: Did anything else happen in Denise's room?

G.F.: Yes.

MR. HARVATH: Can you tell the judge what happened? It's okay.

MS. DAGO [defense counsel]: Judge, again I would object to comments by counsel.

THE COURT: Sustain.

MR. HARVATH: Can you tell the judge what happened? Can you tell the judge yes or no? Judge, I'm going to ask this witness be deemed and declared unavailable at this time."

Defense counsel argued G.F. was responsive, said that nothing happened, and "her demeanor was one of kind of giggling at times or smiling." The trial court found that G.F. was unavailable where she "froze," noting she would not say anything after she testified that respondent unbuttoned her pajama suit. Defense counsel then sought clarification that G.F.'s responses "that nothing happened" would stand in the record. Initially, the trial court responded that none of G.F.'s testimony would be considered, but when the State argued there was no basis to strike G.F.'s testimony where it indicated she was competent but became unavailable to discuss the assault allegations, the court ruled that "it will stand." Defense counsel did not object or move to strike G.F.'s testimony.

The State rested, and the defense moved for a directed finding, arguing that G.F. said nothing happened and her testimony was inconsistent. The trial court denied the motion, stating the out-of-court statements were reliable and corroborated by Dr. Lorand's testimony. Thereafter, defense

counsel stated she wanted to call G.F. to lay a foundation for Denise T.'s testimony that G.F. recanted her allegations four months after the alleged assault. The trial court reiterated its ruling that G.F. was not available.

Denise T. testified G.F. never complained in December 2000 that respondent touched her. After December 2000, Denise T. and P.F. remained friends, played cards, and saw each other almost daily. Denise T. spoke with G.F. and P.F. in a parking lot one evening in April 2001 and asked G.F. if respondent touched her. According to Denise T., G.F. replied "no," and grinned, laughed and put her hand over her mouth. Denise T. testified that P.F. heard this conversation but made no comment.

In rebuttal, P.F. acknowledged having a conversation in April 2001 with Denise T. but testified that G.F. was not present. Moreover, P.F. never heard G.F. tell Denise T. that the incident with respondent did not happen. P.F. and Denise T. lived in the same neighborhood and sometimes saw each other or went shopping, but they did not see each other for several months because of the case.

In closing argument, defense counsel argued G.F.'s testimony during direct examination that "nothing happened" contradicted her out-of-court statements alleging respondent sexually assaulted her. The trial court found respondent delinquent, and respondent appealed, challenging only the trial court's determination that G.F. was unavailable. While this appeal was pending, the Supreme Court in Crawford departed from its prior confrontation clause analysis and announced a framework for evaluating confrontation claims that differed significantly from the analysis that was applicable at the time of respondent's trial. The parties submitted supplemental briefs on the effect of Crawford on the admissibility of G.F.'s out-of-court statements.

ANALYSIS

I. G.F.'s Unavailability

Respondent first contends the trial court erroneously determined that G.F. was unavailable to testify after she made allegedly exculpatory statements during direct examination, and then erred by denying respondent an opportunity to cross-examine her. A trial court's rulings on evidentiary matters will not be reversed absent a clear abuse discretion, whereas evidentiary rulings involving questions

of statutory interpretation or other questions of law are reviewed de novo. People v. Hall, 195 Ill. 2d 1, 20-21 (2000).

Our supreme court found unavailability to be a narrow concept, subject to a rigorous standard. People v. Johnson, 118 Ill. 2d 501, 509 (1987). Child sexual abuse cases present special problems where the child victim may be unable to testify adequately due to fear, guilt or intimidation. Child witnesses are considered unavailable if it is demonstrated to the trial court that the children were unwilling or unable to testify because of fear, unable to communicate in the courtroom setting, or declared incompetent because they were incapable of expressing themselves concerning the matter so as to be understood. People v. Coleman, 205 Ill. App. 3d 567, 583 (1990); People v. Rocha, 191 Ill. App. 3d 529, 539 (1989). The trial court properly applied this unavailability definition in the instant case considering G.F.'s tender years and the circumstances.

G.F. was either unable or unwilling to testify due to fear or an inability to communicate in the courtroom setting. The fact she testified for a short time on direct examination prior to stopping does not change that conclusion. In Coleman, the six-year-old witness was properly declared unavailable after she testified that the defendant had given her a "bad touch" more than once but then froze up and would answer no more questions. Coleman, 205 Ill. App. 3d at 573. The trial court attempted to speak to the child during a recess, but during the court's questioning and on cross-examination, the child responded to general questions by either shaking or nodding her head and would not respond to questions concerning the sexual abuse. Coleman, 205 Ill. App. 3d at 573. We reject respondent's argument that Coleman should be read narrowly to hold that, before a child witness can be found unavailable, the defense must have an opportunity to cross-examine her or the trial court must personally question her. The Coleman court specifically noted that "[o]nce a child witness is unable to proceed with his or her testimony, whether that point occurred prior to taking the stand or subsequently, he or she is properly considered unavailable." Coleman, 205 Ill. App. 3d at 583.

Here, G.F. responded to general questions about her family and school, demonstrated she knew the difference between the truth and a lie, identified respondent in court, and explained how she came to be at his home on the dates of the alleged assaults. However, as soon as the questions

became more specific about the assault, G.F. stopped answering questions. G.F. stated that respondent tried to unbutton her pants and she remembered how he did that, but then she retreated from that answer and said she did not remember. G.F. twice said something unusual happened next, but retreated and responded, "Nothing," when asked to tell the judge exactly what happened. Concerning the second day at respondent's house, G.F. said something happened, did not respond when asked what happened, then said respondent was behind her, but said, "Nothing," when asked, "What did he do?" G.F. stopped answering questions and was allowed to take a recess, have her mother comfort her, and testify from behind the witness stand when direct examination resumed. G.F. testified that respondent unbuttoned her pajama suit but would not respond when asked what happened next. Like the child in Coleman, G.F. froze when asked to recount the alleged incidents of sexual assault.

Despite the best efforts of the prosecutor, G.F. ceased testifying. The prosecutor repeated and rephrased the questions, but G.F. did not answer. The trial court was mindful of the sensitive nature of the proceedings and careful to afford G.F. a fair opportunity to testify without being unduly led. The trial court granted her request for a recess, allowed her mother to comfort her, and acquiesced when G.F. asked to testify from behind the witness stand instead of the center of the room. In addition, the trial court conducted a sidebar with counsel to discuss G.F.'s silence and the State's request for leeway in questioning her. The trial judge was in the best position to observe G.F.'s demeanor and note the duration of her pauses or silence in response to the prosecutor's questions. The decision whether G.F. froze involved fact-finding and the trial court's exercise of discretion based on the specific circumstances of the case. Thus, the trial court's evidentiary ruling is accorded deference on review. See Hall, 195 Ill. 2d at 21. We find that G.F. was properly considered unavailable.

Because the record supports the trial court's determination that G.F. was unavailable, respondent's argument that he was prejudiced by the preclusion of her cross-examination after her limited direct testimony lacks merit. On appeal, the defense is adamant that "respondent does not assign any error to the trial court's decision to allow G.F.'s direct testimony into evidence." In addition, the record is clear that both the State and defense counsel wanted the trial court to allow

G.F.'s limited testimony on direct examination to stand. Defense counsel did not move to strike G.F.'s testimony but, rather, utilized it. Specifically, defense counsel argued in both the motion for a directed finding and closing argument that G.F.'s "nothing" responses meant respondent did nothing to her other than unbutton her pants. The defense cannot change that strategy on appeal to claim respondent was prejudiced by G.F.'s testimony.

## II. Confrontation Clause Violations

Respondent next challenges the admission, pursuant to statutory hearsay exceptions, of G.F.'s statements to Detective Dwyer, DCFS investigator Lewis, and Dr. Lorand. Respondent, citing the new rule announced in Crawford, claims those statements constituted testimonial evidence and violated his right to confrontation because G.F. was not subject to cross-examination at trial and there was no prior opportunity to cross-examine her. We reject the State's argument that respondent waived this issue. Judicial opinions announcing new constitutional rules applicable to criminal cases are retroactive to all cases pending on direct review at the time the new constitutional rule is declared. People v. Ford, 198 Ill. 2d 68, 73 (2001). Moreover, a party may challenge the constitutionality of a statute at any time. People v. Wagener, 196 Ill. 2d 269, 279 (2001). Furthermore, the record establishes the defense stipulated at trial to the admission of the testimony from the section 115-10 motion hearing to avoid unnecessary repetition.

In Crawford, 541 U.S. at 51-54, 158 L. Ed. 2d at 192-94, 124 S. Ct. at 1364-66, the Court noted two principles central to the meaning of the confrontation clause's guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him" (U.S. Const., amend. VI), namely: (1) the confrontation clause was directed against the civil-law mode of criminal procedure, particularly the use of ex parte examinations as evidence against the accused, and (2) the Framers would not have allowed the admission of the testimonial statements of a witness who did not appear at trial unless he was unavailable to testify and the defendant had a prior opportunity for cross-examination. The Court asserted that its case law had been consistent with these principles but acknowledged its rationales had not, as demonstrated in Ohio v. Roberts, 448 U.S. 56, 66, 65 L. Ed. 2d 597, 608, 100 S. Ct. 2531, 2539 (1980), which

conditioned the admissibility of hearsay evidence, regardless of its testimonial nature, on whether it demonstrated adequate indicia of reliability.  Crawford, 541 U.S. at 55-59, 158 L. Ed. 2d at 196-97, 124 S. Ct. at 1367-69.  Where testimonial statements are concerned, the Court renounced the unpredictable, amorphous, subjective Roberts test, stating that courts cannot replace the confrontation clause's prescribed procedure of cross-examination with a procedure of their own devising.  Crawford, 541 U.S. at 61-62, 158 L. Ed. 2d at 199, 124 S. Ct. at 1370.  The Court, however, reiterated that the confrontation clause places no constraints on the use of the declarant's prior testimonial statements when he appears for cross-examination at trial and is present to defend or explain the statements.  Crawford, 541 U.S. at 59 n.9, 158 L. Ed. 2d at 197 n.9, 124 S. Ct. at 1369 n.9.

The Court did not spell out a comprehensive definition of testimonial, but concluded that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."  Crawford, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374.  The Court noted that various formulations of the core class of testimonial statements exist.  Specifically, petitioner's brief suggested that testimonial meant " 'ex parte in-court testimony or its functional equivalent--that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially.' "  Crawford, 541 U.S. at 51, 158 L. Ed. 2d at 193, 124 S. Ct. at 1364 (quoting Brief for Petitioner at 23).  The amici curiae brief of the National Association of Criminal Defense Lawyers (NACDL) suggested the following definition:  " 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' "  Crawford, 541 U.S. at 52, 158 L. Ed. 2d at 193, 124 S. Ct. at 1364 (quoting Brief for NACDL et al. as Amici Curiae at 3).  However, another formulation contained in an earlier Court concurring opinion was limited to " 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony or confessions.' "  Crawford, 541 U.S. at 51-52, 158 L. Ed. 2d at 193, 124 S. Ct. at 1364 (quoting White v. Illinois, 502 U.S. 346, 365, 116 L. Ed. 2d 848, 865, 112 S. Ct. 736, 747 (1992) (Thomas, J., concurring in part and concurring in judgment, joined by Scalia, J.)).  The

<u>Crawford</u> Court, without commenting on the merits of any of the above formulations, noted that they "share[d] a common nucleus and then define[d] the Clause's coverage at various levels of abstraction around it." <u>Crawford</u>, 541 U.S. at 52, 158 L. Ed. 2d at 193, 124 S. Ct. at 1364.

We note, however, that in <u>White</u>, Justice Thomas found problematic the approach of applying the confrontation clause to testimony made in contemplation of legal proceedings. Justice Thomas cautioned that such an approach might prove difficult to apply and would entangle courts in a "multitude of difficulties" in attempting to draw a line between statements made in contemplation of legal proceedings and those not so made where it was not clear whether the declarant or the listener must be contemplating legal proceedings. <u>White</u>, 502 U.S. at 364, 116 L. Ed. 2d at 864-65, 112 S. Ct. at 747 (Thomas, J., concurring in part and concurring in judgment, joined by Scalia, J.). Justice Thomas urged that the confrontation clause should not be construed to extend beyond the historical evil to which it was directed, noting that not even statements made to the police or government officials could be deemed automatically subject to the right to confrontation, like the victim who blurts out an accusation to a passing police officer or the unsuspecting social worker who is told of possible child abuse. <u>White</u>, 502 U.S. at 364-65, 116 L. Ed. 2d at 864-65, 112 S. Ct. at 747 (Thomas, J., concurring in part and concurring in judgment, joined by Scalia, J.).

Along the same vein, the <u>Crawford</u> Court rejected the notion that <u>ex parte</u> testimony could be admissible against a criminal defendant if it was elicited by government officers neutral to the declarant. <u>Crawford</u>, 541 U.S. at 66, 158 L. Ed. 2d at 202, 124 S. Ct. at 1373. The Court also rejected an analysis that assessed the testimonial nature of the declarant's statement based on her perception of her situation, finding that such a determination could only be revealed by cross-examination. <u>Crawford</u>, 541 U.S. at 66, 158 L. Ed. 2d at 202, 124 S. Ct. at 1373. <u>Crawford</u> indicates that governmental involvement in some fashion in the creation of a formal statement is necessary to render the statement testimonial in nature. When other factors are also present (the statement substituted for the declarant's testimony at trial, was produced <u>ex parte</u>, and was accusatory when made), the confrontation clause's guarantee of cross-examination is triggered. <u>Crawford</u>, 541 U.S. at 56 n.7, 158 L. Ed. 2d at 196 n.7, 124 S. Ct. at 1367 n.7 ("Involvement of government officers in the

production of testimony with an eye toward trial presents unique potential for prosecutorial abuse ***").

We find that G.F.'s statement to Detective Dwyer was testimonial. Although some types of hearsay statements, like an offhand, overheard remark or a casual remark to an acquaintance, are not the sort of statements at which the confrontation clause was directed, "[s]tatements taken by police officers in the course of interrogations are *** testimonial under even a narrow standard." Crawford, 541 U.S. at 52, 158 L. Ed. 2d at 193, 124 S. Ct. at 1364. According to Crawford, interrogation is meant in a colloquial rather than a technical, legal sense, and the police officer's function is essentially investigative and prosecutorial. Crawford, 541 U.S. at 53, 158 L. Ed. 2d at 194, 124 S. Ct. at 1365. Thus, the witness's recorded statement knowingly given in response to structured police questioning in Crawford qualified as testimonial under any conceivable definition. Crawford, 541 U.S. at 53 n.4, 158 L. Ed. 2d at 194 n.4, 124 S. Ct. at 1365 n.4.

Detective Dwyer testified that she and her partner were investigating the sex crime involving respondent and interviewed G.F. at headquarters six months after the alleged assault. The detectives told G.F. they were police officers assigned to investigate sex crimes. Detective Dwyer testified that G.F. "knew why she was there" and was asked specific, rather than open-ended, questions during the interview. The day after the detectives interviewed G.F., the State filed the delinquency petition against respondent. G.F.'s accusatory statements made to the police during the interview and naming respondent as the perpetrator clearly implicate the confrontation clause's core concerns. Respondent had no opportunity to cross-examine G.F. regarding the statements she made to the detectives. Based on the trial court's ruling that G.F. was unavailable, she did not complete direct examination at trial and was not subject to any cross-examination. Accordingly, introduction of her statements to the detectives violated respondent's right to confront the witnesses against him.

We also find that G.F.'s statements to DCFS investigator Lewis were testimonial. Given that child abuse has both criminal and social welfare implications, DCFS and the State's Attorney may naturally share some involvement in a particular case. We recognize that our supreme court, in addressing whether responsibility for destruction of evidence by DCFS could be imputed to the State's

Attorney, rejected the notion that child protective service investigators are a prosecutorial arm of the State simply by virtue of their mandate to investigate reports of suspected child abuse and neglect. In re C.J., 166 Ill. 2d 264, 269 (1995). However, where DCFS works at the behest of and in tandem with the State's Attorney with the intent and purpose of assisting in the prosecutorial effort, DCFS functions as an agent of the prosecution. In re C.J., 166 Ill. 2d at 270. To determine, for purposes of a confrontation clause analysis, the extent to which Lewis was working to assist the prosecutorial effort, we review Lewis's testimony in the context of the mechanics of the DCFS investigatory process.

Certain statutory provisions and regulations indicate that DCFS investigators may work in conjunction with law enforcement in assisting the prosecutorial effort. Specifically, DCFS immediately refers reports of alleged child sexual abuse to the police and State's Attorney for consideration of a criminal investigation or other action. 325 ILCS 5/7 (West 2000); 89 Ill. Adm. Code §300.70 (2000). DCFS may delegate the investigation of the report to the police or State's Attorney when they are concurrently conducting a criminal investigation of the same incidents and allegations. 325 ILCS 5/7.3 (West 2000); 89 Ill. Adm. Code §300.80 (2000). In conducting a formal investigation, the DCFS investigator will, after seeing to the safety of the child, interview the people residing in the child's home, the alleged perpetrator and other people who may be helpful to the investigation. 325 ILCS 5/7.4(b)(3) (West 2000). Once the investigator has gathered the important facts from the people involved, a decision or finding must be made by the investigator pending review by a supervisor. 325 ILCS 5/7.12 (West 2000). Where it is not possible to complete an investigation within the time prescribed, DCFS may, for good cause shown, extend the period for making a finding. 325 ILCS 5/7.12 (West 2000). Good cause may include a request from the police or State's Attorney to delay making a determination due to a pending criminal investigation, or because medical reports necessary for a determination are still pending. 89 Ill. Adm. Code §300.110(i)(3)(D) (2000).

Here, Lewis was not able to see G.F. within 24 hours of the March hotline report, but talked to the reporter and learned that respondent allegedly penetrated G.F.'s vagina with his finger. Lewis apparently determined that the report was made in good faith and began a formal investigation. After several unsuccessful attempts to contact G.F. and her mother, Lewis eventually interviewed G.F. in

May during an unscheduled visit to their home. Lewis introduced herself to G.F., assessed G.F.'s credibility and then interviewed her utilizing open-ended questions. During this interview, G.F. accused respondent of the above-mentioned acts of sexual assault. The record does not indicate that G.F. was at imminent risk or taken into protective custody, but she was referred to the hospital emergency room for diagnosis of and treatment for sexual assault. In the context of a confrontation clause analysis, where the focus is on whether the declarant is bearing witness against a criminal defendant when making a formal statement to a government officer with an eye toward prosecution, G.F.'s statements to Lewis were testimonial. See People v. Sisavath, 118 Cal. App. 4th 1396, 13 Cal. Rptr. 3d 753 (2004) (statements of child victim to investigating officer and to an interviewer at a facility specially designed to interview children who are suspected victims of child abuse were testimonial); Snowden v. State, 156 Md. App. 139, 846 A. 2d 36 (2004) (out-of-court statements describing sexual abuse made by children during an interview with a social services investigator were testimonial).

The State argues that certain factors--Lewis's impromptu interview of G.F., the neutral location, the open-ended questions, the absence of any police officer or State's Attorney, the occurrence of the interview prior to the filing of the delinquency petition, and the declarant's age and state of mind--indicate that G.F. was not making a formal, official statement. Those factors, however, were more the result of P.F.'s reluctance to cooperate with DCFS's requests to interview G.F. and do nothing to alter the testimonial nature of G.F.'s statements to Lewis. Moreover, a court's attempt to fashion such factors into some type of litmus test for testimonial evidence would undermine the confrontation clause's protections. Vague standards are manipulable, and the neutral motives of the government official toward the declarant are irrelevant. Crawford, 541 U.S. at 68, 158 L. Ed. 2d at 202, 124 S. Ct. at 1373.

Section 115-10 addresses difficulties inherent in child abuse prosecutions, such as the susceptibility of the child witness due to normal developmental limitations, to forget details when there is a substantial delay between the event and the request to recall it at trial. Section 115-10 allows the testimony of those who heard the child's statements describing any complaint, matter or

detail pertaining to the criminal offense. If the child is not available for cross-examination and the defense has not secured that absence, then the State must lose the advantage of admitting the hearsay that is testimonial. We assign no ill motives to the State, but if the State could simply use the surrogate testimony of social workers provided that certain formalities--like a scheduled interview at a government office in a question-and-answer format--were absent, then prosecutors would have less motivation to acclimate the child witness to the courtroom setting, prepare them for the trial and make them available for the rigors and trauma of cross-examination.

We do not hold that all statements made to a social worker are per se testimonial under Crawford. We think it possible that a scenario could arise in which a report to the DCFS hotline (see People v. Moscat, 3 Misc. 3d 739, 777 N.Y.S. 2d 875 (2004) (call to 911 by domestic assault complainant was not testimonial)), or statements of sexual abuse overheard by a social worker (see People v. Bowen, 183 Ill. 2d 103, 107 (1998)), would be admissible as nontestimonial hearsay.

Regarding G.F.'s hearsay statements to Dr. Lorand, we find that G.F.'s statements describing the cause of symptoms or pain or the general character of the assault were not testimonial in nature. However, G.F.'s statement identifying respondent as the perpetrator was testimonial, and the admission of Dr. Lorand's testimony regarding G.F.'s statement of identification violated respondent's right to confrontation where G.F. was not available at trial for cross-examination.

Dr. Lorand was a member of a child abuse protection unit at the hospital and had previously testified as an expert witness in child abuse cases. DCFS referred G.F. to Dr. Lorand for diagnosis and evaluation of sexual abuse six months after the alleged assault. At trial, Dr. Lorand recounted her physical findings in addition to what G.F. told her about where on her body she had been hurt, the offender's use of a lubricant, the pain, the absence of any blood or discharge, and the identity of the offender.

We do not find controlling the fact that G.F.'s medical exam was the result of a referral from DCFS. The record established that G.F.'s mother failed to take her for any medical treatment or evaluation after the alleged assault. Moreover, government officials like police officers commonly take sexual assault victims to the hospital for treatment and evaluation. We also find unpersuasive

respondent's assertion that the relationship between DCFS and Dr. Lorand at the time of the examination indicated that she constructively acted as the government's agent in interrogating G.F. Dr. Lorand's exam was for a diagnostic purpose, and G.F.'s statement was the by-product of substantive medical activity. Although Dr. Lorand may have been part of a child abuse trauma team, she was not charged with facilitating the prosecution of the case against respondent. As a medical expert with a professional interest in a patient's treatment, Dr. Lorand's primary investment in cooperating with law enforcement agencies was in facilitating the least traumatic method of diagnosis and treatment for the alleged victim, rather than a specific interest in enforcing sexual abuse laws against respondent. In contrast to government officers like the police or DCFS investigators, medical personnel who treat and diagnose sexual assault victims do not take on a similar investigatory or prosecutorial function. Certainly, the medical examination of the victim involves the collection of evidence for later use at a trial, because the victim's body and the injuries sustained may provide evidence of the crime. Moreover, the medical evaluation undoubtedly becomes a component in the determination by the police, State's Attorney, or DCFS investigator regarding whether the alleged assault merits further investigation or prosecution.

Nevertheless, a victim's statements to medical personnel regarding "descriptions of the cause of symptom, pain or sensations, or the inception or general character of the cause or external source thereof" (725 ILCS 5/115-13 (West 2000)), are not testimonial in nature where such statements do not accuse or identify the perpetrator of the assault. G.F.'s statements explaining how she was penetrated, the pain, and the offender's use of a lubricant are relevant in assessing how Dr. Lorand reached her opinion that G.F. sustained sexual abuse and are in accord with the statutory hearsay exception for statements, made by a patient with a selfish interest in treatment, for the purpose of medical diagnosis and treatment. Those statements were not accusatory against respondent at the time made and, thus, do not trigger enhanced protection under the confrontation clause. Respondent's primary focus on G.F.'s entire statement to Dr. Lorand as testimonial, because an objective witness would reasonably believe the statement would be available for use at a later trial, misses the mark. Such an analysis overlooks the crucial "witnesses against" phrase of the confrontation clause and casts too wide a net in

categorizing nonaccusatory statements by sexual assault victims to medical personnel as implicating the confrontation clause's core concerns regarding government production of ex parte evidence against a criminal defendant.

To the extent that G.F.'s statements responded to Dr. Lorand's questions regarding the nature of the alleged attack, the physical exam, and complaints of pain or injury, such statements remain governed by the medical treatment hearsay exception statute. However, G.F.'s accusatory statements identifying respondent as the perpetrator do implicate the core concerns protected by the confrontation clause. When the content of G.F.'s statement concerned fault or identity, then such testimonial statements are only admissible through Dr. Lorand if G.F. testifies at trial and is subject to cross-examination.

We find unpersuasive respondent's apparent contention that Crawford's questioning of the continued viability of its holding in White indicates the Court would deem testimonial a child sexual assault victim's statements to an examining physician made for purposes of medical diagnosis or treatment. In White, the Court held that the prosecution need not produce the declarant child victim and the trial court need not find her unavailable before her out-of-court statements to her babysitter, mother, the investigating police officer, and the emergency room nurse and doctor would be admitted under state-law hearsay exceptions for spontaneous declarations and statements made in the course of securing medical treatment. White, 502 U.S. at 349, 116 L. Ed. 2d at 855, 112 S. Ct. at 739. The Court held that when the proffered hearsay has sufficient guarantees of reliability to come within firmly rooted exceptions to the hearsay rule, the confrontation clause was satisfied. White, 502 U.S. at 357, 116 L. Ed. 2d at 860, 112 S. Ct. at 743. Although the Crawford Court subsequently questioned White, it did so in the context of acknowledging that White's holding admitting a child victim's statement to an investigating police officer as a spontaneous declaration was in tension with the Court's faithful adherence to the Framers' understanding that testimonial statements of witnesses absent from trial were admissible only where the declarant was unavailable and the defendant had a prior opportunity to cross-examine. Crawford, 541 U.S. at 58 n.8, 158 L. Ed. 2d at 197 n.8, 124 S. Ct. at 1368 n.8. Further, the Crawford Court stated that it need not resolve whether White's holding,

which rejected the academics' proposal to apply the confrontation clause only to testimonial statements and leave the remainder to regulation by hearsay law, survived the Crawford decision. Crawford, 541 U.S. at 61, 158 L. Ed. 2d at 198-99, 124 S. Ct. at 1370. In White, the Court did not reach the issue of medical personnel's testimony regarding the perpetrator's identity, and Crawford's criticism of White did not specifically address more than White's admission of the child's statement to the investigating police officer.

The confrontation clause errors in this case were not harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967). In People v. Wilkerson, 87 Ill. 2d 151, 157 (1981), our supreme court noted three approaches for measuring error under Chapman: (1) focusing on the error to determine whether it might have contributed to the conviction; (2) examining the other evidence in the case to see if overwhelming evidence supports the conviction; and (3) determining whether the evidence is cumulative or merely duplicates properly admitted evidence. Here, P.F. provided testimony describing G.F.'s outcry that respondent had "juiced" her. The evidence also included Dr. Lorand's physical findings and expert opinion that G.F. was sexually abused. However, at trial, G.F. was not able to testify about the incidents of alleged abuse during her limited direct examination before she froze, and Denise T. testified that G.F. recanted her allegations against respondent. The testimonial statements made by G.F. to Detective Dwyer, DCFS investigator Lewis, and Dr. Lorand were the only other evidence presented at trial to identify respondent as the perpetrator. Moreover, those testimonial statements provided significantly more detail about the assault than did P.F.'s testimony regarding G.F.'s statements. There is a reasonable probability the admission of the testimonial evidence contributed to the adjudication of delinquency. In addition, the evidence in this case was not overwhelming.

Retrial is not barred on double jeopardy grounds, because the evidence was sufficient to support respondent's adjudication of delinquency. See People v. Dean, 175 Ill. 2d 244, 261 (1997). After reviewing the evidence in the light most favorable to the prosecution, we find a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. People v. Olivera, 164 Ill. 2d 382, 393 (1995). We consider all the evidence introduced at the original trial,

-20-

even if erroneously admitted. <u>Olivera</u>, 164 Ill. 2d at 393-94. P.F.'s testimony regarding G.F.'s accusations against respondent was consistent with Dr. Lorand's findings that G.F. sustained sexual abuse. In addition, P.F. rebutted Denise T.'s testimony that G.F. recanted her accusations against respondent.

Therefore, we reverse the judgment of the circuit court of Cook County and remand this cause for proceedings consistent with this opinion. Accordingly, pursuant to the Illinois Supreme Court's supervisory order noted at the outset of this opinion, we clarify again that we vacate our January 22, 2008 order in this matter and reinstate our September 7, 2007 opinion with the modification that this cause is to be remanded to the circuit court for a hearing on the State's claim of doctrine of forfeiture by wrongdoing. This hearing is to be held within 45 days of the entry of the instant opinion. Because we have concluded that remand to the circuit court for a hearing on the State's claim of forfeiture by wrongdoing is appropriate, we further provide, as required by the supervisory order of the Illinois Supreme Court, the following direction to the circuit court on remand, pursuant to <u>People v. Stechly</u>, 225 Ill. 2d 246 (2007):

1. On remand, a factual determination should be made as to whether the State can show by a preponderance of the evidence that defendant forfeited his confrontation claim by intentionally intimidating G.F. not to talk about the offenses, since the charges for which there was sufficient admissible evidence could be reinstated if there was such a forfeiture;

2. If, upon completion of the <u>Stechly</u> hearing, the circuit court finds there was no such forfeiture by defendant, there should be a new trial to be held within 60 day of such finding, at which the hearsay found testimonial in our September 7, 2007 opinion should be excluded unless G.F. testifies and a legal basis can be provided by the prosecution for the admission of the hearsay previously found testimonial and inadmissible in our September 7, 2007 opinion.

In addition, we retain jurisdiction and require that a status report be filed by both parties as to the progress of these hearings. That is, the parties are required to file with our court a status report within 14 days following the conclusion of the circuit court's hearing and its factual determination regarding

1-03-0551

the issue of forfeiture by wrongdoing to inform our court of the subsequent actions both parties will take pursuant to the circuit court's ruling.

Reversed and remanded, with directions.

GALLAGHER, J., concurs.

O'MARA FROSSARD, J., specially concurs.

JUSTICE O'MARA FROSSARD, specially concurring:

I write to emphasize that whether a statement is testimonial in nature cannot be answered in a vacuum, but requires examination of the totality of the circumstances surrounding the statement. I further emphasize, as recognized by this opinion, not all statements made to a DCFS investigator or social worker are per se inadmissible testimonial evidence under Crawford.

As noted by the opinion, section 115-10 allows the testimony of those who heard a child's statement describing any complaint, matter, or detail pertaining to the criminal offense regardless of the testimonial nature of the child's statement. Section 115-10 was designed to address the difficulties inherent in prosecuting cases involving child victims. However, such prosecutions are now required to be undertaken consistent with the Crawford limitations as articulated by the United States Supreme Court. Those limitations will impact application of section 115-10 in cases involving child victims. The Crawford decision significantly changed the application of the sixth amendment's confrontation clause and the relationship of that clause to various rules of evidence regarding hearsay and hearsay exceptions.

Under Crawford, the sixth amendment's confrontation clause precludes the use of a "testimonial" statement made by a witness who does not testify at a criminal trial, unless the witness is unavailable to testify at trial *and* was previously subjected to cross-examination. Crawford, 541 U.S. at 67-68, 158 L. Ed. 2d at 202-03, 124 S. Ct. at 1373-74. However, where the statement is not "testimonial" in nature, the confrontation clause is not implicated and the statement's admissibility is determined by applying evidentiary hearsay rules and various hearsay exceptions. Crawford, 541 U.S. at 67-68, 158 L. Ed. 2d at 202-03, 124 S. Ct. at 1373-74.

In the instant case, application of section 115-10 conflicts with the holding in Crawford.

-22-

Crawford recognized that such a conflict could occur but, as to nontestimonial evidence, concluded that the states are entitled to determine the admissibility of statements consistent with the hearsay rules and hearsay exceptions. Crawford, 541 U.S. at 67-68, 158 L. Ed. 2d at 203, 125 S. Ct. at 1374. Regarding the admissibility of testimonial evidence, Crawford requires adherence to the demands imposed by the sixth amendment as indicated by the following:

> "Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' " Crawford, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374.

While Crawford did not provide a comprehensive definition of "testimonial," it did recognize the following:

> "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." Crawford, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374.

Chief Justice Rehnquist's concurring opinion in Crawford criticizes the majority opinion for failing to provide a more comprehensive definition of a testimonial statement:

> "[T]housands of federal prosecutors and *** tens of thousands of state prosecutors need answers as to what beyond the specific kinds of 'testimony' the Court lists *** is covered by the new rule. They need them now, not months or years from now. Rules of criminal evidence are applied every day in courts throughout the country, and parties should not be left in the dark in this manner."

1-03-0551

> Crawford, 541 U.S. at 75-76, 158 L. Ed. 2d at 207-08, 124 S. Ct. at
> 1378 (Rehnquist, C.J., concurring, joined by O'Connor, J.)

The instant case underscores the significance of the concerns expressed by the Chief Justice. Crawford requires testimonial evidence of an unavailable witness to be previously subjected to cross-examination as a prerequisite for admissibility. Section 115-10 requires the statement to provide sufficient safeguards of reliability but, contrary to Crawford, does not require previous cross-examination of the testimonial evidence as a prerequisite for admissibility. In Illinois there are hundreds of cases every year involving child victims where a child makes statements to investigators, DCFS workers, and medical personnel relied upon by the State to prosecute the alleged offender. Those statements are seldom, if ever, previously subjected to cross-examination as now required under the Crawford standards for admissibility.

The case law and the legal literature reflect that most often child victims, due to their tender years, are unavailable to testify at trial. The problem presented by child victims of crime who are unavailable to testify due to their tender age was resolved by section 115-10, which allows in evidence children's statements to investigators, DCFS workers, or medical personnel, without prior cross-examination, providing they are found reliable by a judge in a pretrial hearing. That approach was specifically rejected in Crawford: "Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation." Crawford, 541 U.S. at 61, 158 L. Ed. 2d at 199, 124 S. Ct. at 1370. Under Crawford, if the unavailable child's statement is testimonial, then the statement is inadmissible unless the statement was previously cross-examined.

Since Crawford was decided on March 8, 2004, a small number of cases from other states have attempted to provide a definition of a testimonial statement. In People v. Moscat, 3 Misc. 3d 739, 777 N.Y.S.2d 875 (2004), the court found that "[a] testimonial statement is produced when the government summons a citizen to be a witness." Moscat, 3 Misc. 3d at 745 , 777 N.Y.S.2d at 879. In support of that definition, the court in Moscat noted that a "person who gives a formal statement, or deposition, or affidavit is conscious that he is bearing witness, and

-24-

1-03-0551

that his words will impact further legal proceedings." Moscat, 3 Misc. 3d at 746, 777 N.Y.S.2d at 880.

In People v. Sisavath, 118 Cal. App. 4th 1396, 13 Cal. Rptr. 3d 753 (2004), the court found a statement given by a victim to an investigating officer to be testimonial as it was given knowingly in response to structured police questioning. Sisavath, 118 Cal. App. 4th at 1402, 13 Cal. Rptr. 3d at 758. Sisavath further found a victim's statement to a forensic interview specialist to be testimonial. The court noted that the victim's statement was made under circumstances which would lead an objective witness reasonably to believe the statement would be used at trial. Sisavath, 118 Cal. App. 4th at 1402, 13 Cal. Rptr. 3d at 7858. Similarly, in Snowden v. State of Maryland, 156 Md. App. 139, 846 A.2d 36 (2004), the court found statements by the children victims to social workers were "testimonial" and their admission in evidence violated defendant's sixth amendment right to confrontation. In support of that finding, the court in Snowden noted that the children were interviewed by a social worker for the express purpose of developing their testimony for trial. Snowden, 156 Md. App. at 157, 846 A.2d at 47.

The critical question regarding G.F.'s statements to DCFS investigator Lewis is whether those statements were testimonial. DCFS is a legislatively created agency responsible for protecting and promoting the welfare of the children of Illinois. In re C.J., 166 Ill. 2d 264, 268 (1995). Crimes against children implicate both criminal and social welfare concerns. DCFS and the State's Attorney may share involvement in cases involving child victims; however, that factor does not render all statements made to a DCFS investigator per se testimonial under Crawford. The question of whether a statement made by a child is testimonial in nature cannot be answered in a vacuum, but requires examination of the totality of the circumstances surrounding the statement. Whether G.F.'s statement is testimonial requires a close examination of the testimony provided by DCFS investigator Lewis and the totality of the circumstances surrounding the statement.

Lewis testified that she was an investigator with the division of child protection for DCFS. She was conducting "an investigation of child sex abuse with the victim by the name of

-25-

1-03-0551

G.F." She received the initial report in March of 2001, but first spoke to G.F. on May 4, 2001. After introducing herself she testified that she "asked several questions in order to do what we call qualify her as a victim – an alleged victim." That testimony by DCFS investigator Lewis could be considered as demonstrating the involvement of a government officer in the production of testimony with an eye toward trial. In reviewing such testimony which had not been previously subjected to cross-examination, Crawford noted "Involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse ***." Crawford, 541 U.S. at 56, 158 L. Ed. 2d at 196 n.7, 124 S. Ct. at 1367 n.7. In the instant case, after Lewis found that G.F. understood the difference between telling the truth and telling a lie, G.F. spoke to DCFS investigator Lewis in detail about the incident involving the minor-respondent T.T.

The substance of the information provided by G.F. in her conversation with DCFS investigator Lewis reflected that the declarant G.F. was bearing witness against the minor-respondent and that information was generated with an eye toward prosecution. Due to the tender age of G.F., she may not have fully appreciated the fact that she was bearing witness against the minor-respondent. That fact is not particularly significant because Crawford has indicated that the perception of the witness can only be revealed by cross-examination. Crawford, 541 U.S. at 66, 158 L. Ed. 2d at 202, 124 S. Ct. at 1373. As previously noted, G.F. was never cross-examined.

Based on the totality of the circumstances, the statements made by G.F. to DCFS investigator Lewis were testimonial. A review of the testimony provided by DCFS investigator Lewis together with the totality of the circumstances in the context of the confrontation clause analysis articulated by Crawford demonstrated that G.F.'s statements to DCFS investigator Lewis were inadmissible testimonial evidence.

However, as recognized by this opinion, not all information provided to DCFS is per se inadmissible testimonial evidence under Crawford. In Moscat, 3 Misc. 3d at 746, 777 N.Y.S.2d at 875, the 911 call of a domestic violence victim who did not testify was found to be admissible.

-26-

The court rejected the defendant's argument that such a call was testimonial under <u>Crawford</u>, recognizing that such a call is the "electronically augmented equivalent of a loud cry for help." <u>Moscat</u>, 3 Misc. 3d at 746, 777 N.Y.S.2d at 880. A report to the DCFS hotline may not necessarily implicate testimonial concerns under the <u>Crawford</u> confrontation clause analysis.

The <u>Crawford</u> confrontation clause analysis should not undermine the admission of a cry for help by a child victim when such a cry does not qualify as testimonial. Where nontestimonial evidence is at issue, it is consistent with the purpose of the United States Constitution to exempt such statements from confrontation clause scrutiny and "afford the States flexibility in their development of hearsay law." <u>Crawford</u>, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. The holding of the instant case should be narrowly construed in the context of the facts presented and the principles articulated in <u>Crawford</u>.

1-03-0551

**REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT**
**(Front Sheet to be Attached to Each Case)**

| | |
|---|---|
| Please use the following form | In re T.T., a Minor <br><br> (The People of the State of Illinois, <br><br> Petitioner-Appellee, <br><br> v. <br><br> T.T., <br><br> Respondent-Appellant). |

Docket No.

COURT
Opinion
 Filed

No.   1-03-0551

Appellate Court of Illinois
First District, <u>FIFTH</u> Division

July 25, 2008
(Give month, day and year)

JUSTICES

PRESIDING JUSTICE JAMES FITZGERALD SMITH DELIVERED THE MODIFIED OPINION OF THE COURT:

GALLAGHER, J.,   concurs,
O'MARA FROSSARD, J.,    specially concurs.

Lower Court and Trial Judge(s) in form indicated in margin:

APPEAL from the Circuit Court of Cook County; the Hon_____
Judge Presiding.

Appeal from the Circuit Court of Cook County.

The Hon. **RODNEY H. BROOKS,** Judge presiding.

Indicate if attorney represents APPELLANTS or APPELLEES and include attorney's of counsel. Indicate the word or NONE if not represented.

FOR APPELLANTS
John Doe, of Chicago

For APPELLEES, :

APPELLANT: OFFICE OF THE STATE APPELLATE DEFENDER, Chicago, IL Michael J. Pelletier, Deputy Defender; Maya Szilak, Assistant Appellate Defender

Smith and Smith of Chicago,

APPELLEE: STATE'S ATTORNEY, COUNTY OF COOK, Chicago, IL Richard A. Devine, State's Attorney; Renee Goldfarb, Janet Powers Doyle, Ericka Graunke, Assistant State's Attorneys

(Joseph Brown, of counsel)
Add attorneys for third-party appellants and/or appellees.