# Illinois Official Reports

## Supreme Court

---

### *In re Brandon P.*, 2014 IL 116653

---

| | |
|---|---|
| Caption in Supreme Court: | *In re* BRANDON P., a Minor (The People of the State of Illinois, Appellee, v. Brandon P., Appellant). |
| Docket No. | 116653 |
| Filed | May 22, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Confrontation error occurred where a young sex-offense victim was unavailable at the trial at which her testimonial statements to a detective were improperly admitted, but this was harmless beyond a reasonable doubt where the evidence did not contribute to the guilt finding and was merely cumulative to other properly admitted evidence overwhelmingly showing guilt, including an outcry statement to the mother and male DNA on the victim's underwear. |
| Decision Under Review | Appeal from the Appellate Court for the Fourth District; heard in that court on appeal from the Circuit Court of Vermilion County, the Hon. Craig H. DeArmond, Judge, presiding. |
| Judgment | Appellate court judgment affirmed. |
| Counsel on Appeal | Michael J. Pelletier, State Appellate Defender, Karen Munoz, Deputy Defender, and Catherine K. Hart, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.<br><br>Lisa Madigan, Attorney General, of Springfield (Carolyn E. Shapiro, Solicitor General, and Michael M. Glick and Erin M. O'Connell, Assistant Attorneys General, of Chicago, of counsel), for the People. |

Justices

JUSTICE THOMAS delivered the judgment of the court, with opinion.
Chief Justice Garman and Justices Freeman, Kilbride, Karmeier, Burke, and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1    Respondent, Brandon P., was charged by petition for adjudication of wardship with aggravated criminal sexual abuse (720 ILCS 5/12-16(c)(2)(i) (West 2010)). The petition alleged that the then-14-year-old respondent committed an act of sexual conduct against his 3-year-old cousin, M.J. Following an adjudicatory hearing, the circuit court of Vermilion County found respondent guilty and sentenced him to the Illinois Department of Juvenile Justice for an indeterminate period not to exceed (1) the period for which an adult could be committed for the same act, or (2) the date of respondent's twenty-first birthday, whichever came first. 705 ILCS 405/5-710(7), 5-750 (West 2010). Respondent appealed, and the appellate court affirmed the adjudication. 2013 IL App (4th) 111022. This court allowed respondent's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. July 1, 2013).

¶ 2                                    BACKGROUND

¶ 3    On November 15, 2010, respondent was charged by petition for adjudication of wardship with aggravated criminal sexual abuse in that he, "being under the age of 17 years, committed an act of sexual conduct against [M.J.], who was under nine years of age when the offense was committed, in violation of 720 ILCS 5/12-16(c)(2)(i)." On December 21, 2010, the State filed its notice of intent to present evidence under section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10 (West 2010)). The State gave notice that it intended to offer the statements that M.J. made to her mother on October 23, 2010, and to Detective Troy Hogren, of the Danville police department, on October 26, 2010. The State indicated that M.J.'s statement to her mother was that "Brandon put that stuff in his mouth on her vagina which made her vagina hurt and Brandon put his finger in her vagina." M.J.'s statement to Detective Hogren was that "Brandon put his finger in her vagina which made her feel bad and Brandon spit on her vagina and put his penis on her at Uncle Mike's."

¶ 4    The section 115-10 hearing began on May 10, 2011. M.J.'s mother, Teresa J., testified that on October 23, 2010, she was living with her children: 19-year-old Stephanie; 19-year-old Kayla; 7-year-old Lucas; 5-year-old Alana; and 3-year-old M.J. On that day, Teresa picked up respondent, her nephew, from the police station, for reasons unrelated to the instant case. Teresa brought respondent to her house, where he spent the night. Teresa and Stephanie left the house the next morning to run errands. After Teresa returned home, she was sitting at the dining room table with Stephanie, Kayla, and Jeff, Kayla's boyfriend. Lucas, Alana, M.J., and respondent were upstairs playing in Lucas's bedroom. Teresa heard M.J. scream, so Jeff went

up to check on the kids. Lucas's bedroom door was shut, and something was tied around the door. Jeff opened the door and the kids came downstairs. Teresa then left to pick up her brother, Mike, respondent's father. Mike and Teresa returned to Teresa's home. Mike and respondent left shortly thereafter.

¶ 5    Teresa testified as follows concerning what happened after respondent left:

"Q. [Assistant State's Attorney:] And then what happened after Brandon left?

A. Uhm, I can't remember approximately how long it was after Brandon left, but [M.J.] had come downstairs; and she was—she was holding herself.

Q. What do you mean by holding herself?

A. She had her hand on her—her pee-pee as she would say, and she had—I thought she had to go to the bathroom. And I asked her if she had to go, and she said yes but it hurt. And I told her to go ahead and—I believe I told her to go ahead and go. Then I asked her why it hurt, and she said because Brandon had put spit in her pee-pee.

Q. And after she said—after she said that, did you ask any further questions?

A. I, uhm, I asked her, uhm—well, then I scooped her up and I took her to—I took her to my brother's house."

¶ 6    When they arrived at Mike's house, Teresa told M.J. to tell Uncle Mike and Aunt Aundrea, respondent's parents, what M.J. had just told Teresa. M.J. told them that "Brandon had put had [*sic*] spit on her pee-pee." Teresa then called 911 and took M.J. to the emergency room.

¶ 7    On cross-examination, the following exchange took place:

"Q. [Defense attorney:] So when you were questioning or talking to [M.J.], you—she stated to you that her pee-pee hurt; is that correct?

A. Yes.

Q. And then what exactly did you say after that?

A. Her pee-pee hurt, that's why she couldn't go pee. I asked her why, and she said that Brandon had spit on her pee-pee.

Q. And she—she used the actual word spit?

A. She went like—said, 'He did this and put it on my pee-pee.'

THE COURT: The record should reflect that the witness inserted her right index finger in her mouth indicating the motion by the child."

¶ 8    On redirect examination, the assistant State's Attorney asked Teresa whether M.J. "actually said spit or what words she used, did she not actually say it or did she just make that motion with her finger?" Teresa replied that M.J. "made the motion with her finger, and she said—I'm getting frustrated. I'm sorry. Yeah, she made that motion with her finger and said that she had—he had spit—put spit in her pee-pee."

¶ 9    The section 115-10 hearing was continued to May 26, 2011. On that date, Detective Troy Hogren testified that he was a police officer for the City of Danville, Illinois, and was assigned to the juvenile division of the police department. In October 2010, Detective Hogren became involved in the investigation concerning M.J. Detective Hogren interviewed M.J. on October 26, 2010, at the public safety building. Teresa was present when Detective Hogren interviewed

M.J. Detective Hogren introduced himself to M.J., explained that he was a police officer and worked with kids, that M.J. was not in any trouble, and that he was there to talk with her about something that may have happened to her. M.J. sat on her mother's lap while Detective Hogren was talking to her.

¶ 10 With regard to the investigation, Detective Hogren testified:

"Well, I explained to [M.J.] that I wanted to talk to her about what she had told her mother a couple days ago and that I was here to talk to her about something that may have happened to her that she didn't like, and she told me that she was at home there in Lucas's bedroom and it was her and Lucas and Alana and Brandon and they were playing police and cops, some sort of a police and cops game, and she couldn't tell me what Brandon's last name was she just told me that Brandon was Uncle Mike's son. And then Teresa explained that that was his—that was—Uncle Mike was her brother. And she indicated to me that they were playing this game and that Brandon stuck his finger in her pee pee.

Q. She said that he stuck his finger in her pee pee?

A. Yes.

Q. Did—did you ask her what pee pee was or—

A. Well, when she said that she pointed, she made a motion with her finger in between her legs.

Q. And pointed in between her legs?

A. Yes, in the front.

Q. And after she made that statement did you inquire more of her from that?

A. I asked her if she—if she had her clothes on or off. She said her clothes were on. I asked her if she had told anybody what happened to her and she said she told Aundrea and Uncle Mike which would be Brandon's parents what had happened to her. She said she told them that Brandon spit in her pee pee and that Brandon put his weiner on her at Uncle Mike's house.

Q. And she said that happened at Uncle Mike's house?

A. Well, she said that Brandon put his weiner on her at Uncle Mike's house."

¶ 11 Following argument, the trial court ruled that there was a sufficient basis to find M.J.'s statements to her mother and to Detective Hogren reliable and therefore held that those statements would be admissible at trial pursuant to section 115-10.

¶ 12 Respondent's adjudicatory hearing began on August 8, 2011. Teresa was the first witness, and testified consistently with her testimony at the section 115-10 hearing. With regard to the allegations against respondent, Teresa testified that five to ten minutes after respondent left her house, M.J. came downstairs and said she had to go to the bathroom. Teresa told M.J. to go, but M.J. said she could not go because it hurt. When asked if she knew what M.J. was referring to when M.J. said that it hurt, Teresa testified, "She said it hurt to go potty. And I asked her why it hurt, and that's when she told me because—because Brandon put spit in her pee-pee."

- 4 -

¶ 13    After a recess, the proceedings reconvened in the jury room for M.J.'s testimony. The State, M.J., Teresa, respondent, defense counsel, and respondent's father, Mike, were present for M.J.'s testimony.

¶ 14    The following exchange took place during the trial court's preliminary questioning of M.J.:

"THE COURT: Can you tell me how old you are?

A. Four.

THE COURT: Four. Did you just turn four?

A. (Witness nodding head up and down)

THE COURT: Do you know what your birth date is?

A. (Witness shaking her head back and forth)

THE COURT: No? Did you have a birthday party?

A. (Witness nodding head up and down)

THE COURT: Was it a good party?

A. (Witness nodding head up and down)

THE COURT: Okay. Do you know where we are? Do you know what this building is called?

A. (Witness shaking head back and forth)

THE COURT: No? Okay. Do you know what we're doing here?

A. (Witness shaking head back and forth)

THE COURT: Not really? Will you answer some questions for us if we ask you some questions?

A. (Witness nodding head up and down)"

When asked if she would tell the truth if she was asked questions, M.J. said yes.

¶ 15    The assistant State's Attorney then began questioning M.J. M.J. stated her name for the record and said that she lived in Oakwood with her mother, her sisters Stephanie, Kayla, and Alana, and her brother, Lucas. M.J. said that she was in preschool, but did not know when she started school.

¶ 16    The assistant State's Attorney then began questioning M.J. about the incident at issue. The following exchange took place:

"Q. [M.J.], do you remember when you had to go to the hospital?

A. (Witness shaking head back and forth)

Q. You don't remember?

A. (Witness shaking head back and forth)

Q. Do you remember having to talk to the police?

A. (Witness shaking head back and forth)

Q. Can you answer out loud for me?

A. No.

Q. You don't remember?

A. (Witness shaking head back and forth)

Q. Do you remember Mommy taking you to the hospital?

A. No.

Q. No? Do you ever—do you have a cousin named Brandon?

A. (No response)

Q. Do you?

A. (Witness shaking head back and forth)

Q. Can you answer out loud for me?

A. No.

Q. No? Did you see Brandon in here today?

A. (Witness nodding head up and down)

Q. Can you point to him?

A. (No response)

TERESA: Listen to what Lindsay is saying and answer her question, okay?

Q. Can you point to Brandon?

A. (Witness shaking head back and forth)

Q. No? Did something bad happen to you?

A. (Witness shaking head back and forth)

Q. You don't remember having to go to the hospital because something bad happened?

A. (Witness nodding head up and down)

Q. You do remember going to the hospital?

A. Um-um.

TERESA: She's getting confused.

Q. Do you want to talk to us?

A. (No response)

THE COURT: She shrugs her shoulders.

Q. Can I have just a minute.

THE COURT: No, she's—she's being questioned. You can't talk to her separately.

Q. Okay.

TERESA: Can I say something or no?

THE COURT: No. That's part of the problem. We have to deal with it this way.

Q. Your Honor, I'm not going to ask any other questions."

Defense counsel then declined to question M.J.

¶ 17    The State next called M.J.'s brother Lucas to testify. Lucas testified that he remembered when M.J. had to go to the hospital, and testified that he knew why she had to go to the hospital. Lucas said that he was with respondent, Alana and M.J. that day, and that they were

playing games. Lucas testified that he saw something happen to M.J. Lucas testified as follows:

"Q. And what did you see happen to [M.J.]?

A. Thinking.

Q. Okay. Can you tell us what you saw.

A. Um-um.

Q. You said you were thinking. Will you tell us what you saw happen?

A. I'm thinking.

Q. Did something happen when you were in the bedroom?

A. Yes.

Q. Who all was in the bedroom?

A. Brandon, me, and [M.J.] and Alana.

Q. And what was [M.J.] doing?

A. Laying down.

Q. Laying down. Where was she laying down at?

A. On the floor.

Q. Okay. Did [M.J.] have her clothes on? Did she have a shirt on?

A. Her shirt is on.

Q. Did she have her pants on?

A. No.

Q. No? Okay. And what did you see happen to [M.J.]?

A. (No response)

Q. Can you tell the Judge what you saw happen to [M.J.]?

***

Q. Lucas, can you tell the Judge what you saw.

A. I'm scared.

Q. That's okay, Bud. You're scared to tell us?

A. (Witness nodding head up and down)

Q. You can tell us. Nothing is going to happen to you.

THE COURT: Is there anything that would make you less scared?

A. (No response)

THE COURT: Don't know. Anything that would make you unscared?

A. (Witness shaking head back and forth)

Q. Lucas, are you okay?

A. I'm scared.

Q. Okay. I won't ask you any more questions. Okay? Do you want to tell the Judge what you saw?

A. I want to leave."

Defense counsel declined to question Lucas, so Lucas was excused.

¶ 18    The State then called Detective Hogren to testify. Detective Hogren began to testify concerning his interview with M.J. Defense counsel objected, arguing that M.J. was unavailable as a witness. Defense counsel further argued that M.J.'s statement to Detective Hogren was testimonial, and thus was not admissible at trial because the defense did not have an opportunity to cross-examine M.J. The trial court noted defense counsel's objection for the record, but stated that it could not make a determination at that point because the State might recall M.J. to testify. The trial court acknowledged that it might find the testimony inadmissible at a later point. Detective Hogren then testified concerning his interview with M.J. Detective Hogren's trial testimony concerning that interview was consistent with his testimony at the section 115-10 hearing.

¶ 19    Detective Hogren also testified that he interviewed respondent on October 25, 2010. Respondent told Detective Hogren that he was at Teresa's house on October 24, 2010. Respondent said he was upstairs with Lucas, M.J., and Alana in Lucas's bedroom, and that he showed the kids some pictures of naked ladies on his cell phone. With regard to the allegations against respondent, Detective Hogren testified:

"I asked him if he had had any contact with [M.J.] or any of the other children. He said that he hugged [M.J.] when he got there. When he got there, he hugged her. When I explained to him what [M.J.] was alleging had happened, he said he didn't want to talk to us any longer, that he wasn't a pervert, and that this was incest."

Detective Hogren did not question respondent any further at that point.

¶ 20    On cross-examination, Detective Hogren testified that neither M.J. nor Teresa mentioned anything about a locked door at the house. M.J. also never told Detective Hogren that she screamed or yelled loudly that day. Detective Hogren clarified on redirect examination that he never interviewed Teresa regarding the complaint.

¶ 21    The State presented numerous witnesses to testify concerning the chain of custody of the DNA evidence. With regard to the DNA evidence, Dana Pitchford testified for the State that she is a forensic scientist specializing in forensic biology and DNA analysis, employed by the Illinois State Police Crime Lab in Springfield. Pitchford tested the sexual assault evidence collection kit collected from M.J. for the presence of semen. The kit contained vaginal swabs taken from M.J., anal swabs taken from M.J., and a swab taken from M.J.'s underwear.

¶ 22    A P30 analysis of the vaginal swab indicated semen. The P30 analysis is an acid phosphatase test, where two chemicals give a bright purple appearance when there is a reaction. The bright purple appearance is graded from one to four, with four being the most intense color and one being the weakest. Pitchford graded the color in the test as a one. Because the P30 analysis gave a reaction, Pitchford then did a slide sperm search, which was negative, as no sperm cells were identified. The acid phosphatase reaction was negative on the anal swab, so no further testing was done on that swab. The acid phosphatase reaction also was negative on the swabbing collected from M.J.'s underwear, but given the description of the occurrence, the swab was preserved for possible DNA analysis.

¶ 23    Pitchford then explained the difference between semen being indicated or identified. Pitchford testified that:

> "The difference is indicated or identified. And sperm cells being present are an identification. The only way sperm cells can be there is if semen is present.
>
> Semen is indicated, and that term is utilized because I am utilizing a test called P30 that I know can react with other body fluids, with other body fluids being some vaginal secretions as well as breast milk have been known to cause a reaction depending on the person's body type. And because of that, P30 is found in extremely high levels in semen. You typically would not expect to find those high levels in vaginal secretions or breast milk, but we have seen some reactions; and because of that, we are not capable of reporting out that semen is identified. We only say that it's indicated."

¶ 24    Aaron Small testified that he is a forensic scientist employed by the Illinois State Police Forensic Science Laboratory in Springfield. Small testified concerning the DNA analysis in this case. Small explained that a DNA profile is a collection of DNA types over 15 loci. The loci is the marker for the area looked at in the analysis. Small looks at 15 different areas of the entire genetic code in a cell, and one sex determining locus. The profile put together from all those loci is the profile of an individual.

¶ 25    Small testified that he did a differential extraction of the vaginal swab taken from M.J., which is done when samples have semen indicated on them. However, the vaginal swab taken from M.J. did not contain enough male DNA to obtain a DNA profile through the autosomal DNA.

¶ 26    Small also examined the sample taken from M.J.'s underwear. Because there was no semen indicated in that sample, Small followed normal non-semen extraction protocol, and did not do a differential extraction. This sample contained a mixture of male and female DNA. The female DNA profile matched M.J. There was a partial DNA male profile, meaning that there was a male DNA profile in some of the loci tested, but it was not detected in all the loci. Respondent could not be excluded from the areas where the male DNA was detected. The statistics were approximately one in 100,000 African-Americans, one in 7,400 Caucasians, and one in 16,000 Southwest Hispanics.

¶ 27    On cross-examination, Small testified that there were 7 out of 16 loci where respondent could not be excluded. When asked whether respondent was excluded from the other nine loci, Small explained:

> "There are nine loci where I do not—I interpret the profile as there is no minor profile that is showing up in those loci. There is DNA that is to be for the victim's profile. Therefore, it is only at the seven loci that I actually got results. It's not saying that there aren't—it's not saying that the person or people are excluded from the remaining loci. It's saying that there's no result obtained from those loci."

¶ 28    On redirect examination, Small explained that results were not obtained from the other nine loci because:

> "The amount of DNA, male DNA, that would have been input into the amplification reaction definitely plays into that. This sample contained a male-to-female mixture. It

contained a male-to-female mixture in a ratio of one to thirteen. I could not amplify thirteen nanograms of female DNA versus one nanogram of male DNA. Therefore, I had to dilute the sample in order to get a profile that would be tolerant in our system.

The amount of DNA input into our system is specific, and it needs to be within a range. If it's over a specific range, the amount of total DNA, our tests will not work properly. Therefore, in order to get the amount of the DNA in a proper range, it was diluted; and that definitely reduced the amount, not the ratio, of male to female, diluted the amount of male DNA that was input into the sample."

¶ 29    At the close of the State's case, defense counsel argued that because M.J. was unavailable to testify at trial, Detective Hogren could not testify to statements that M.J. made to him. Defense counsel maintained that those statements were testimonial under *Crawford v. Washington*, 541 U.S. 36 (2004). Further, defendant had no prior opportunity to cross-examine M.J., and M.J. was unavailable as a witness. Consequently, admission of Detective Hogren's testimony would violate the confrontation clause.

¶ 30    The trial court rejected defense counsel's claim that M.J.'s statements to Detective Hogren were inadmissible under section 115-10. The trial court agreed that M.J. was unavailable as a witness. The trial court noted that M.J. "[t]estified initially to preliminary matters and then essentially froze up. It's clear the child is unavailable as a witness." The trial court, however, held that M.J.'s statements to Detective Hogren were not testimonial and therefore were admissible under section 115-10. Thereafter, the trial court also denied respondent's motion for a directed verdict.

¶ 31    Respondent's father, Mike, was the sole witness to testify on respondent's behalf. Mike testified that he called Teresa numerous times on the day in question to check on respondent. Mike's impression was that Teresa was gone from her home from early in the morning until she met him later in the day.

¶ 32    Following closing arguments, the trial court found respondent guilty of the offense of aggravated criminal sexual abuse. The trial court later denied respondent's motion for a new trial.

¶ 33    On appeal, respondent argued that: (1) M.J.'s statement to Detective Hogren was testimonial and therefore was inadmissible because M.J. was unavailable to testify; (2) M.J.'s statement to Detective Hogren was unreliable under section 115-10; (3) respondent's right to the effective assistance of counsel was violated when counsel failed to object to the admission of certain unreliable scientific evidence; and (4) respondent's right to a fair trial was violated by cumulative trial errors.

¶ 34    In response to respondent's first issue, the State conceded that M.J. was unavailable as a witness, so that her statement to Detective Hogren would be admissible at trial only if that statement was non-testimonial. The State argued that M.J.'s statement was non-testimonial and therefore was properly admitted.

¶ 35    Prior to oral argument, the appellate court directed the parties to be prepared to address eight cases that addressed when a witness is unavailable for purposes of the confrontation clause. Respondent filed a supplemental brief arguing that the State had specifically waived

the issue of M.J.'s unavailability by agreeing at trial to the trial court's finding that M.J. was unavailable, and by expressly conceding on appeal that M.J. was unavailable. Respondent also argued that the appellate court should affirm the trial court's finding that M.J. was unavailable because she did not testify at trial. The State then filed a supplemental brief, withdrawing its concession that M.J. was unavailable at trial, and now arguing that M.J. was available.

¶ 36    On appeal, the appellate court first held that the trial court did not abuse its discretion in admitting M.J.'s statements to Hogren because those statements were reliable. 2013 IL App (4th) 111022, ¶ 41. The appellate court then stated:

> "Somewhat inexplicably, the State *** initially conceded that M.J. was unavailable. Nevertheless, the State argues that M.J.'s statements to Hogren were not testimonial and therefore were properly admitted. Because the record shows that M.J. was available for cross-examination, we reject the State's concession and conclude that respondent was not denied his constitutional right to confront M.J." *Id.* ¶ 44.

The appellate court observed that when a declarant appears for cross-examination at trial, the confrontation clause places no constraints on the use of prior testimonial statements. *Id.* ¶ 45.

¶ 37    With regard to its finding that M.J. was available, the appellate court later explained further that:

> "M.J. was present for cross-examination but did not answer any questions about the events which were the subject of her statements to Hogren because defense counsel did not ask M.J. any questions about those events. Despite M.J.'s apparent unwillingness or inability to testify on direct examination about these events, M.J. 'appeared' for cross-examination at trial within the meaning of the confrontation clause. M.J. appeared for cross-examination because defense counsel could have cross-examined her but chose not to do so. M.J.'s failure to testify about her statements to Hogren on direct examination does not relieve respondent of his obligation to cross-examine M.J." *Id.* ¶ 48.

¶ 38    The appellate court next rejected respondent's claim that his defense counsel's failure to object to the admission of certain evidence amounted to ineffective assistance of counsel. *Id.* ¶ 56. The appellate court also rejected respondent's claim that he was deprived of a fair trial. *Id.* ¶ 59. The appellate court therefore affirmed the trial court. This appeal followed.

¶ 39                                ANALYSIS

¶ 40    Respondent raised four issues in his appeal to this court. Respondent argued that: (1) M.J.'s statement to Detective Hogren was testimonial hearsay; (2) M.J. was unavailable as a witness at respondent's trial, so that the admission of her testimonial hearsay violated respondent's rights under the confrontation clause; (3) even if M.J. was available for purposes of cross-examination, M.J.'s statement to Detective Hogren was inadmissible under section 115-10(b)(2)(A) because M.J. did not testify on direct examination; and (4) the admission of the improper testimonial hearsay was not harmless error.

¶ 41    In response, the State makes two concessions. The State first concedes that, for purposes of this appeal, M.J. was unavailable. The State also concedes that the trial court erred in deeming

- 11 -

M.J.'s statement to Detective Hogren to be non-testimonial. The State argues, however, that the trial court's judgment should be affirmed because the trial court's error in admitting M.J.'s statement to Detective Hogren was harmless beyond a reasonable doubt.

¶ 42 In light of the State's concessions, the only issue remaining before this court is whether the admission of M.J.'s statement to Detective Hogren at respondent's trial was harmless error. Before we address that issue, however, we will briefly address the appellate court's rejection of the State's concession on appeal.

¶ 43 In this case, the trial court, the assistant State's Attorney, and respondent's counsel all agreed at trial that M.J. was unavailable. The State's appellate brief also conceded that M.J. was not available as a witness at respondent's trial. Nonetheless, the appellate court *sua sponte* raised the issue of whether M.J. was available and rejected the State's concession that M.J. was not available.

¶ 44 It is true that a reviewing court is not bound by a party's concession. *People v. Nunez*, 236 Ill. 2d 488, 493 (2010). However, in this case, the appellate court erred in rejecting the State's concession that M.J. was not available and in addressing the issue *sua sponte*.

¶ 45 The issue of unavailable witnesses, in the context of section 115-10, was addressed in *People v. Stechly*, 225 Ill. 2d 246 (2007). *Stechly* first noted that a trial court's ruling on evidentiary matters will not be reversed absent a clear abuse of discretion. *Id*. at 312. Here, the appellate court did not review the trial court's ruling on M.J.'s availability for abuse of discretion. Rather, the appellate court essentially conducted its own *de novo* review of the record to find that M.J. "appeared" for cross-examination at trial within the meaning of the confrontation clause.

¶ 46 In addition, in finding that M.J. was available for cross-examination at trial, the appellate court ignored precedent from this court to the contrary. *Stechly* held that fear and youth are factors to be considered by a court in determining whether a child witness is unavailable. *Id*. at 313. The *Stechly* court stated:

> "Our appellate court has concluded that by the amendment to section 115-10 the legislature intended 'to include within the meaning of "unavailable" witnesses those children who are unable to testify because of fear, inability to communicate in the courtroom setting, or incompetence.' [Citations.] We agree with these opinions. Notwithstanding our holding in [*People v. Johnson*, 118 Ill. 2d 501 (1987),] that unwillingness to testify cannot constitute unavailability to testify *for purposes of Rule 414*, we believe that in the separate specific context of section 115-10, unavailability includes those child witnesses who are unable to testify because of fear." (Emphasis in original.) *Id*. at 315.

¶ 47 There is no question, based upon the record in this case, that M.J. was unavailable to testify at respondent's trial based upon both her youth and fear. M.J. could barely answer the trial court's preliminary questions, and then completely froze when the State attempted to begin its direct examination of her. The trial court, respondent's counsel, and the assistant State's Attorney, all of whom were present in the jury room and observed M.J.'s attempt to testify, all agreed that M.J. was unavailable. Under the circumstances, the trial court did not abuse its

discretion in declaring M.J. unavailable. The appellate court therefore erred in rejecting the State's concession and in finding that M.J. was available to testify for purposes of section 115-10.

¶ 48 We also agree with the State that M.J.'s statements to Detective Hogren were testimonial, so that the admission of Detective Hogren's testimony concerning those statements violated the confrontation clause. The United States Supreme Court in *Davis v. Washington*, 547 U.S. 813 (2006), noted the difference between nontestimonial and testimonial statements given to a police officer. The Court explained:

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id*. at 822.

Here, the primary purpose of Detective Hogren's interview with M.J. was to establish or prove past events potentially relevant to later criminal prosecution, so that M.J.'s statements to Detective Hogren were testimonial.

¶ 49 As noted, in light of the State's concessions, we need not address the first three issues raised by respondent in his appeal. Accordingly, we now address the sole issue remaining in the case: whether the erroneous admission of M.J.'s statements to Detective Hogren at respondent's trial was harmless error beyond a reasonable doubt.

¶ 50 Confrontation clause violations are subject to harmless error review. *In re Rolandis G.*, 232 Ill. 2d 13, 43 (2008). The test is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained at trial. *Id*. When determining whether an error is harmless, a reviewing court may, "(1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *Id*.

¶ 51 Respondent argues that the focus must be on whether the State has proven beyond a reasonable doubt that the error did not contribute to the guilty verdict. Respondent maintains that the answer to that question in this case is no, because M.J.'s testimonial hearsay statement to Detective Hogren did contribute to the trial court finding respondent guilty of aggravated criminal sexual abuse. Respondent characterizes M.J.'s statement to her mother as half non-verbal and open to interpretation. Further, all Lucas could add was that he saw M.J. lying down on the floor with her shirt on and her pants off. The State did not elicit whether it was M.J.'s outer pants or underpants that were off. Therefore, the trier of fact never heard evidence whether M.J. was naked from the waist down, or was wearing underpants. Further, even though Lucas, Alana, M.J., and respondent were in the room, the trier of fact never heard any testimony concerning where everyone else in the room was, or what they were doing, when the incident occurred.

¶ 52    Given the preceding, respondent argues that Detective Hogren's testimony was essential to buttress the State's case. Respondent notes that Detective Hogren testified that during his interview of M.J., M.J. made several accusatory statements, including the specific statement that respondent put his finger and spit in her "pee-pee," and that respondent had put his "weiner" on her.

¶ 53    Respondent further contends that Detective Hogren's testimony was crucial to buttress the State's case because the remaining evidence in this case was not overwhelming. Respondent notes that the evidence adduced at trial was that respondent could not be excluded at seven loci, and there was insufficient DNA to come to any conclusion as to the other nine loci. The State's witness, Small, could not say that the DNA obtained from M.J.'s underwear matched respondent. Rather, Small could only say that respondent could not be excluded from the list of loci where they were identified.

¶ 54    In response, the State maintains that the trial court's error in this case was harmless beyond a reasonable doubt. The State asserts that M.J.'s spontaneous, non-testimonial statement to her mother, Teresa, given under circumstances that underscore its credibility, was the lynchpin of the case against respondent. This properly admitted evidence overwhelmingly established respondent's guilt, and Detective Hogren's testimony, which was duplicative of Teresa's testimony, did not contribute to respondent's conviction. The State contends that this case is nearly identical to *In re Rolandis G.*, 232 Ill. 2d 13 (2008), where the court held that the trial court's error in admitting two testimonial statements from the victim was harmless error.

¶ 55    In *Rolandis G.*, 11-year-old Rolandis was adjudicated delinquent for the aggravated criminal sexual assault of 6-year-old Von J. At Rolandis's trial, Von was called to testify and answered some preliminary questions about himself, made an in-court identification of Rolandis, and stated that he knew Rolandis from the neighborhood. When asked about the events at issue, however, Von refused to respond. Defense counsel declined the opportunity to cross-examine Von.

¶ 56    Von's mother, Jacqueline, testified that on the day at issue, Von came home from playing outside, accompanied by Rolandis, and immediately went to the bathroom. Rolandis stayed by the front door, but left when Von refused to come back outside with him. Jacqueline testified that she saw Von coughing, spitting and rinsing his mouth out with water while in the bathroom. When Jacqueline asked Von what was wrong, he said his "throat was hot." After a few minutes, Von returned to the bathroom and started coughing and spitting again.

¶ 57    Soon thereafter, Von came into the living room where Jacqueline was sitting and told her that, "Rolandis made me suck his dick." When Jacqueline questioned Von, he told her that Rolandis had forced him to a nearby wooded area and threatened him with a stick if he did not do what Rolandis wanted. Jacqueline called the police, who arrived within 10 minutes.

¶ 58    Officer Cure was the State's next witness. He testified that Von told him that Rolandis had forced Von to "suck his dick," and that Rolandis was holding a stick when he did so. Von told Officer Cure that he choked while performing the act, and that a fluid had come out of Rolandis's penis.

¶ 59 Detective Swanberg also testified that he observed Von's interview at the Carrie Lynn Children's Center, conducted by child advocate Jackie Weber. The interview was videotaped. The videotape was played for the court. In the interview, Weber asked Von to identify various parts of a boy's body using two anatomical drawings. Weber wrote down Von's responses on the drawings. In response to Weber's questioning, Von repeated what he had told his mother and Officer Cure, and also added some additional details.

¶ 60 The trial court in *Rolandis G.* held that, even though Von had been unable to answer questions at trial concerning Rolandis's conduct, Von had "testified" within the meaning of section 115-10(b)(2)(A). *In re Rolandis G.*, 232 Ill. 2d at 20. Therefore, the trial court held that the testimony of Von's mother and Officer Cure concerning Von's out-of-court statements, as well as Von's videotaped interview with Weber, were admissible as exceptions to the hearsay rule. *Id.*

¶ 61 On appeal, the State conceded that Von was unavailable to testify. The appellate court reversed and remanded Rolandis's adjudication, finding that Von's statements to Officer Cure and to Jackie Weber were testimonial and inadmissible under *Crawford*. *Id*. at 22. The State was granted leave to appeal.

¶ 62 The *Rolandis G.* court held that the trial court erred in allowing the testimony of Officer Cure and the videotape of Von's interview with Weber into evidence at trial, as both statements were testimonial and Von was unavailable as a witness. However, the court found that the properly admitted evidence overwhelmingly supported Rolandis's conviction, so that the admission of Von's testimonial statements to Officer Cure and Weber was harmless beyond a reasonable doubt. *Id.* at 43.

¶ 63 In finding harmless error, the court noted that: there was no inconsistency concerning the perpetrator's identity; Von spontaneously revealed to his mother, in properly admitted testimony, that Rolandis made him "suck his dick"; Von's actions upon returning home correlated to the type of sexual abuse Von said occurred; and Von's actions strongly indicated that the abuse occurred very recently, at a time when Von was solely in Rolandis's custody. *Id.* at 43-44. Rolandis admitted at trial that he alone walked Von home, through the wooded area. *Id*. at 44. Consequently, Jacqueline's testimony concerning her observations of Von's behavior, in addition to her testimony regarding Von's statement to her, overwhelmingly supported Rolandis's conviction. *Id.* Jacqueline's testimony was clear and uncontroverted. *Id*. at 46. Moreover, the improperly admitted evidence was largely repetitive of the evidence presented by Jacqueline, and did not resolve any material issue. *Id.* For those reasons, the admission of Von's testimonial statements to Officer Cure and Weber, although error, was harmless beyond a reasonable doubt. *Id.*

¶ 64 The State argues that considerations identical to those in *Rolandis G.* compel a finding of harmless error in this case. The State notes that M.J.'s statement to her mother was given spontaneously, almost immediately after respondent left the house, M.J.'s complaint of pain upon urination was consistent with the type of abuse she alleged, and respondent spent the morning with M.J. in Lucas's bedroom. In addition, forensic evidence, which was not present in *Rolandis G.*, corroborated M.J.'s statement. Small testified that a swab from M.J.'s underwear contained both her DNA and the DNA of a male contributor, and respondent could

- 15 -

not be excluded from the DNA profile at seven loci, which would be expected to occur randomly in the population once every 7,400 unrelated Caucasian individuals. These findings corroborate M.J.'s assertion that a male touched her genitals, and that the male was respondent. Although the DNA profile could not be described as a match to respondent, the partial match at seven loci is highly probative given that M.J. was in respondent's company for much of the day before the swabs were taken, making it highly unlikely that the male DNA was left by someone else.

¶ 65       Respondent disagrees, arguing that the instant case is distinguishable from *Rolandis G.* on a number of grounds. Respondent notes that in contrast to six-year-old Von, M.J. was three years old and minimally verbal. Moreover, M.J.'s statement to her mother was half gesture, and was vague enough that it is unclear exactly what happened, while Von clearly told his mother that Rolandis had made Von "suck his dick."

¶ 66       Respondent contends that this case is closer to *In re T.T.*, 384 Ill. App. 3d 147 (2007), and *People v. Stechly*, 225 Ill. 2d 246 (2007). Respondent states that in *In re T.T.*, the appellate court held that the error in admitting testimonial hearsay was not harmless beyond a reasonable doubt because the testimonial statements of the complainant, who was unavailable at trial, provided significantly more detail about the assault than the properly admitted evidence. Likewise, in *Stechly*, the court could not conclude beyond a reasonable doubt that the admission of hearsay statements did not contribute to the finding of guilt. Here too, the State cannot show beyond a reasonable doubt that the admission of M.J.'s hearsay statements to Detective Hogren did not contribute to the finding of guilt.

¶ 67       In *Stechly*, M.M., the five-year-old complainant, did not make an immediate outcry. Rather, Brenda Galete, who began babysitting M.M. in November 1998, testified at defendant's trial that on January 13, 1999, M.M. told Galete about an incident of sexual abuse by "Bob" that took place in December 1998. M.M. never specified which Bob. Galete testified that Joan, M.M.'s mother, had other people babysitting M.M., including Joan's nephew Bob Reilly, who lived in Joan's apartment building, and who babysat for M.M. "a lot." When M.M. told Galete about the sexual abuse, Galete took M.M. to Joan's place of employment and insisted that they take M.M. to the hospital. Galete testified that during the ride to the hospital, she did not recall hearing Joan ask M.M. what happened. On cross-examination, Galete testified that she thought there were other people that had molested M.M., and that she told the police that she thought Joan was molesting M.M.

¶ 68       Joan testified at the State's section 115-10 hearing that Galete came to her place of employment and told Joan that they needed to take M.M. to the hospital. During the ride to the hospital, when Joan asked M.M. what was wrong, M.M. described an incident of sexual abuse by "Bob." Joan understood "Bob" to be the defendant, Robert Stechly, who lived in Joan's apartment building and was in a relationship with Joan. Joan said that defendant babysat M.M. in his apartment about two weeks before Christmas 1998. Joan denied that her nephew, Bob Reilly, ever babysat M.M. Joan's trial testimony was largely consistent with her testimony at the section 115-10 hearing, although Joan testified at the section 115-10 hearing that during the ride to the hospital, M.M. identified her abuser as "Bob," while Joan's testimony at trial was that M.M. identified her abuser as "Robert Stechly" during the trip to the hospital.

¶ 69        Ann Grote, a clinical specialist in charge of the hospital's child abuse team, spoke with Joan at the hospital. Joan told Grote that the perpetrator was "the babysitter," a man with whom Joan was in a relationship. Grote interviewed M.M. and asked her why she had come to the hospital. M.M. said she was there because of what "Bob" had done to her. M.M. described the incident of sexual abuse that she had previously described to Joan. Grote's testimony at defendant's trial was essentially consistent with her testimony at the section 115-10 hearing.

¶ 70        Perry Yates, a social worker at M.M.'s school, testified that he interviewed M.M. on January 14, 1999. Yates began his interview with M.M. by asking M.M. what she could tell him about "Robert Stechly." M.M. described an incident of sexual abuse similar to what she had described to Joan and to Grote. Although Yates mentioned the name "Robert Stechly" in his initial question to M.M., M.M. never mentioned defendant by name during the interview. Yates's testimony at trial also was consistent with his testimony at the section 115-10 hearing.

¶ 71        The defendant in *Stechly* had signed a confession. However, the defendant recanted that confession at trial. The defendant also presented testimony from a psychiatrist that the defendant did not understand the ramifications of signing a statement.

¶ 72        The *Stechly* case was originally tried before a jury, but the jury could not reach a decision and a mistrial was declared. The parties then proceeded with a bench trial and stipulated to the testimony from defendant's trial. The trial court found the defendant guilty, and the appellate court affirmed.

¶ 73        The *Stechly* court found that M.M.'s statements to her mother were nontestimonial, and that her statements to Grote and Yates were testimonial, and should not have been admitted at defendant's trial because M.M. was unavailable as a witness, and defendant had not had an opportunity to cross-examine M.M. The court further held, in a plurality opinion, that the error in admitting M.M.'s testimonial statements was not harmless error. *Stechly*, 225 Ill. 2d at 305. The court found that the improperly admitted statements could not be considered merely duplicative of the properly admitted evidence. *Id*. at 306. The court noted that M.M.'s statements to Grote and to Yates were substantially similar to her statement to Joan, but "the fact that the testimony was coming from adults who had no personal stake in the matter at hand, no acquaintance with Joan or defendant, and little or no acquaintance with M.M., and the strong similarity of the statements, gave them a power beyond simple duplication of Joan's testimony as to what her daughter told her." *Id*. at 305. The court also found significant the fact that both Grotes and Yates testified that M.M. demonstrated the conduct at issue through the use of dolls, another fact that reinforced the believability of M.M.'s statements and distinguished them from M.M.'s statements to Joan. *Id*. Further, the conversation between Yates and M.M. began with Yates asking M.M. what she could tell him about "Robert Stechly." The fact that M.M. recounted the events in question in response to a generic question about the defendant was crucial evidence, particularly where the defense at trial concerned the identity of the abuser. *Id*. at 305-06.

¶ 74        The *Stechly* plurality concluded that M.M.'s consistent repetition of the story strongly reinforced its believability, and that reinforcement could have overridden any doubts which might have arisen in light of the significant conflicts and inconsistencies between Galete's testimony, Joan's testimony, and defendant's confession. *Stechly*, 225 Ill. 2d at 309. Finally,

the court stated that the conclusion that the evidence against defendant was not overwhelming was buttressed by the fact that the jurors at the defendant's first trial could not agree on a verdict. *Id*. at 310.

¶ 75    In *In re T.T.*, the 14-year-old respondent was adjudicated delinquent for committing two offenses of aggravated criminal sexual assault against seven-year-old G.F. *In re T.T.*, 384 Ill. App. 3d 147. At a section 115-10 hearing, G.F.'s mother, P.F., testified that she left G.F. at Denise T.'s house for two and a half days. Denise T. was respondent's mother. G.F.'s sister picked G.F. up on December 18, 2000, and when G.F. walked into the house, she told her mother, without prompting or questioning, that " 'Pooh [respondent]' had 'juiced' her and put his 'ding-a-ling' in her 'bootie' and her 'fannie.' " Based upon G.F.'s prior use of those terms, her mother understood G.F. to mean that respondent had sexual intercourse with her, and put his penis in her buttocks and vagina. G.F. said that when she told Denise T. and respondent's sister about the incidents, they bathed her. G.F.'s mother did not contact the police or take G.F. for medical treatment.

¶ 76    G.F. was interviewed by DCFS investigator Lewis on May 4, 2001, nearly five months later, after Lewis received a hotline report concerning G.F. G.F. was not examined by a physician until May 7, 2001. G.F. told Lewis that "Pooh" stuck his "thing" in her "fannie" and in her, pointing to indicate her vaginal area. G.F. also told Lewis that respondent brought her into the bathroom and stuck his "thing" into her "bootie." G.F. said that a "thing" was a "ding-a-ling." G.F. said that she told Denise T. and respondent's sister what had happened, and also told her mother, P.F., as soon as she saw her.

¶ 77    G.F. also was interviewed by Detective Dwyer. G.F. told Detective Dwyer that respondent put his "thing" in her "privates." G.F. said that a "thing" is what boys pee from, and "privates" are what girls pee from, pointing to her vaginal area. G.F. told Detective Dwyer that respondent then brought her into the bathroom and put his "thing" in her "bootie" and in her "privates." G.F. pointed to her behind to indicate what a "bootie" was. G.F. said that she told Denise T. and respondent's sister about the incidents.

¶ 78    At trial, the parties stipulated to the testimony of G.F.'s mother, investigator Lewis, and Detective Dwyer from the section 115-10 hearing. G.F. was called to testify and answered some preliminary questions. When the questions about the assault became more specific, G.F. stopped answering questions, saying that she did not remember or that nothing happened. Following a break, G.F. testified that respondent unbuttoned her pajama suit in Denise T.'s bedroom but would not respond when asked what happened next. The State asked that G.F. be declared unavailable. Defense counsel responded that G.F. was responsive, she said that nothing happened, and " 'her demeanor was one of kind of giggling at times or smiling.' " *In re T.T.*, 384 Ill. App. 3d at 154. The trial court determined that G.F. was unavailable.

¶ 79    Denise T., respondent's mother, testified at trial that G.F. never complained that respondent had touched her. Denise T. remained friends with G.F.'s mother, P.F., after the incident. They played cards and saw one another almost daily. Denise T. testified that she spoke with G.F. and P.F. in April 2001, and she asked G.F. if respondent had touched her. G.F. said "no," grinned, laughed, and put her hand over her mouth. Denise T. testified that P.F. heard her conversation with G.F., but made no comment.

¶ 80    In rebuttal, P.F. acknowledged having a conversation with Denise T. in April 2001, but denied that G.F. was present. P.F. never heard G.F. tell Denise T. that the incident never happened. P.F. testified that she and Denise T. lived in the same neighborhood and sometimes saw one another or went shopping, but said they did not see one another for several months because of the case.

¶ 81    The appellate court found that G.F.'s statements to investigator Lewis and Detective Dwyer were testimonial, and held that the confrontation clause errors were not harmless beyond a reasonable doubt. The appellate court stated:

> "Here, P.F. provided testimony describing G.F.'s outcry that respondent had 'juiced' her. The evidence also included Dr. Lorand's physical findings and expert opinion that G.F. was sexually abused. However, at trial, G.F. was not able to testify about the incidents of alleged abuse during her limited direct examination before she froze, and Denise T. testified that G.F. recanted her allegations against respondent. The testimonial statements made by G.F. to Detective Dwyer, DCFS investigator Lewis, and Dr. Lorand were the only other evidence presented at trial to identify respondent as the perpetrator. Moreover, those testimonial statements provided significantly more detail about the assault than did P.F.'s testimony regarding G.F.'s statements. There is a reasonable probability the admission of the testimonial evidence contributed to the adjudication of delinquency. In addition, the evidence in this case was not overwhelming." *In re T.T.*, 384 Ill. App. 3d at 166.

The appellate court therefore reversed the judgment of the trial court and remanded for further proceedings.

¶ 82    Respondent contends that the instant case is similar to *Stechly* and *In re T.T.* Respondent argues that the evidence in this case was not overwhelming, nor was Detective Hogren's testimony duplicative of M.J.'s initial outcry to her mother. Rather, similar to the testimony at issue in *Stechly* and *In re T.T.*, Detective Hogren's testimony was significantly more detailed than Teresa's testimony. Respondent also asserts that the State's scientific evidence was equivocal at best, and merely failed to exclude respondent from a group of individuals whose DNA profile might have matched at seven loci. The finding of male DNA on M.J.'s underwear merely means that a male touched M.J.'s underwear. Respondent posits several innocent explanations for the male DNA, including the possibility that: a male folded M.J.'s underwear; a male put M.J.'s laundry away; a male picked M.J.'s clothes out of the closet for her; or a male helped M.J. get dressed. Consequently, respondent maintains that the State has not proven beyond a reasonable doubt that M.J.'s statements to Detective Hogren did not contribute to his adjudication for aggravated criminal sexual abuse, so that the error in this case was not harmless.

¶ 83    Upon review, we disagree with respondent that the facts of this case are analogous to *Stechly* and *In re T.T.*, and distinguishable from *Rolandis G.* There was a question in *Stechly* concerning the identity of the perpetrator, and the properly admitted testimony was inconsistent and contradictory. Given those inconsistencies and contradictions, the court could not say that the improperly admitted testimony played no part in the trial court's finding of guilt.

¶ 84    Likewise in *In re T.T.*, the evidence against the respondent was not overwhelming. The properly admitted testimony of P.F. was contradicted by the testimony of Denise T. Further, P.F.'s testimony was not clear and convincing, given that P.F. never contacted the police or took G.F. for a medical examination following her spontaneous outcry. The assault only came to the attention of authorities through a hotline call to investigator Lewis several months later. Under the circumstances, it was likely that G.F.'s repetition of the story to investigator Lewis and Detective Dwyer, in even greater detail, reinforced the believability of P.F.'s testimony. As in *Stechly*, the properly admitted evidence in *In re T.T.* was not so overwhelming that it was clear beyond a reasonable doubt that the improperly admitted testimony played no part in the adjudication of guilt.

¶ 85    In contrast to the evidence in *Stechly* and *In re T.T.*, the properly admitted evidence in this case overwhelmingly established respondent's guilt. We agree with the State that this case is similar to *Rolandis G.* As in *Rolandis G.*, and in contrast to *Stechly*, there was no inconsistency here concerning the perpetrator's identity. Further, unlike *Stechly* and *In re T.T.*, there were no conflicts and inconsistencies in the properly admitted testimony in this case. Similar to Von's outcry to his mother in *Rolandis G.*, soon after respondent left Teresa's house, M.J. spontaneously revealed to her mother that respondent had put spit on her "pee-pee." Respondent describes M.J.'s outcry to her mother as half gesture and vague, based upon Teresa's cross-examination testimony at the section 115-10 hearing. On cross-examination, Teresa testified that M.J. said, respondent "did this and put it on my pee-pee," with the court explaining that Teresa inserted her right index finger into her mouth indicating the motion by M.J. We note, however, that Teresa clarified on redirect examination during the section 115-10 hearing that M.J. both made a motion with her finger and said that respondent had "put spit in her pee-pee."

¶ 86    M.J.'s actions after respondent left the house also correlated to the type of sexual abuse M.J. said had occurred, and strongly indicated that the abuse occurred very recently. Teresa testified that five or ten minutes after respondent left her house, M.J. was holding herself and complained that she had to go to the bathroom but it hurt.

¶ 87    In addition to Teresa's testimony, Lucas testified that something happened to M.J. when she was in the bedroom with him, Alana, and respondent. Lucas testified that M.J. was lying down on the floor and did not have pants on.

¶ 88    During his interview with Detective Hogren, respondent confirmed that he was in the bedroom with Lucas, Alana, and M.J., and admitted that he showed the children some pictures of naked women on his cell phone.

¶ 89    As the State observes, in addition to the properly admitted testimonial evidence, this case also included forensic evidence, which was not present in *Rolandis G.*, *Stechly* or *In re T.T.* Although the DNA evidence was not a match for respondent, respondent could not be excluded from seven loci in the DNA profile, which would be expected to occur randomly in the population once every 7,400 unrelated Caucasian individuals. This evidence certainly is probative, given that the evidence is consistent with M.J.'s statement that respondent touched her genitals. It is clear, then, that the properly admitted evidence in this case overwhelmingly supports respondent's conviction.

¶ 90    As noted, respondent also contends that the error in this case was not harmless because Detective Hogren's testimony contained additional details not included in Teresa's testimony. Respondent argues that those additional details contributed to his conviction. The additional details were that M.J. said that respondent had "stuck his finger in her pee pee," and pointed between her legs, and that M.J. told her Aunt Aundrea and Uncle Mike that respondent spit in her pee-pee and put his weiner on her. Respondent asserts that in light of the additional details, Detective Hogren's testimony cannot be considered repetitive of Teresa's testimony.

¶ 91    We disagree. The court in *Rolandis G.* noted that the improperly admitted testimony of Officer Cure, and the videotaped evidence of Von's interview with Weber, contained additional details not present in the properly admitted testimony of Von's mother, but concluded nonetheless that the evidence presented was largely repetitive of the properly admitted evidence, and did not resolve any material issues in the case. Notably, the videotaped evidence in *Rolandis G.* showed Weber asking Von to identify various parts of a boy's body using two anatomical drawings, front and back, with Von's responses written on the drawings.

¶ 92    Here, the improperly admitted testimonial evidence added even less to the case against respondent than the evidence found repetitive and cumulative in *Rolandis G.* This case involves the improper testimonial evidence of only one witness. We do not find it compelling that M.J.'s statement to Teresa may have been slightly less verbal than her statement to Detective Hogren. Although M.J. told Detective Hogren the additional detail that respondent "put his weiner" on her, that detail did not resolve any material issue in the case. Upon review, we find that Detective Hogren's testimony was merely cumulative of Teresa's properly admitted testimony. The error in admitting Detective Hogren's testimony did not contribute to respondent's conviction.

¶ 93                                CONCLUSION

¶ 94    We find therefore, beyond a reasonable doubt, that the improperly admitted testimony of Detective Hogren was cumulative of the properly admitted evidence, that the improperly admitted testimony of Detective Hogren did not contribute to respondent's adjudication of guilt, and that the properly admitted evidence in this case overwhelmingly supports respondent's adjudication. The admission of Detective Hogren's improper testimonial hearsay was harmless error beyond a reasonable doubt. For those reasons, we affirm the appellate court's decision affirming respondent's adjudication of aggravated criminal sexual abuse.

¶ 95    Appellate court judgment affirmed.